**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

YASMIN MONTANO,

        Plaintiff,

v.                                  No. CV 14-0634 WJ/GJF

PATRICK R. DONAHOE,
Postmaster General,

        Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment on Plaintiff's Counts I and III, filed on September 18, 2015 (**Doc. 67**).  Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is not well-taken and, accordingly, is **DENIED**.

### BACKGROUND

This is an employment discrimination case in which Plaintiff alleges discrimination and retaliation by her supervisors, Michael Flores ("Flores") and Humberto Trujillo ("Trujillo").  Trujillo temporarily replaced Flores as Plaintiff's supervisor from March to early July of 2013.  Plaintiff also alleges a whistleblower claim under the ELM USPS ("United States Postal Service") Rule §666, et seq.  The Complaint alleges gender discrimination, harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. as follows:

Count I                – Title VII sexual harassment against Michael Flores
Count II            – Title VII retaliation against Michael Flores
Count III          – Title VII sexual harassment against Humberto Trujillo
Count IV         – Title VII retaliation against Humberto Trujillo

<table>
<tr><td>Count V</td><td>– Violation of USPS Labor Manual Rule §666.22 (Discrimination and Retaliation)</td></tr>
<tr><td>Count VI</td><td>– Violation of USPS employee labor manual §666.22 (Whistleblower Protection Retaliation).</td></tr>
</table>

Defendant denies Plaintiff's claims and denies that Plaintiff has been harassed or discriminated against.  Defendant also denies that Plaintiff has been subject to retaliation, or that she has a private right of action to assert a claim under the ELM USPS Rule § 666, *et seq*. Defendant has moved separately for summary judgment on Plaintiff's claims for discrimination and retaliation based on her gender.  *See* Doc. 68.   This Memorandum Opinion and Order addresses only Plaintiff's Counts I and III alleging sexual harassment.

## I.    FACTS[1]

Defendant's statement of undisputed facts is largely a recitation of Plaintiff's allegations rather than undisputed material facts which, if left undisputed, would entitle Defendant to summary judgment. They are as follows.

Plaintiff began work for the United States Postal Service ("USPS") in June 1985.  She served as one of three Managers of Postal Operations ("MPOO") for nine years within the New Mexico District, overseeing Postmasters around New Mexico.  In 2010, the New Mexico District was consolidated into the Arizona District and Ms. Montano's position was eliminated. Ms. Montano was not selected for a MPOO position in the newly consolidated District.  She was hired on July 11, 2011 as the Postmaster of Santa Fe, New Mexico, retaining her level 25 pay for a period of two years while serving in the level 24 Santa Fe Postmaster position.  Flores, who was Plaintiff's former fellow MPOO, was hired at the highest level (level 25), thereby assuming a supervisory position over Plaintiff.  Plaintiff reported to MPOO Mike Flores while in the Santa

---

[1]  The Court will generally omit references to supporting exhibits because references are provided in the briefs. Plaintiffs' exhibits are presented in Doc. 115, which contains exhibits A through CC.  Defendant has also filed an appendix/supplement of exhibits (Doc. 70) which is meant for the other pending motion as to Counts II and IV, but which Plaintiff refers to at times in response to the motion addressing Counts I and III.

Fe position.  Plaintiff alleges that when Flores became Plaintiff's supervisor he immediately began a campaign of sex discrimination and harassment against her, belittling her and disrespecting her in the workplace, in an effort to ruin her reputation.  While Mr. Flores was serving a detail in Long Beach, California, Humberto Trujillo served as the acting MPOO and as Plaintiff's supervisor from March 2013 until Plaintiff took sick leave on July 6, 2013.  Plaintiff alleges that both Mr. Flores and Mr. Trujillo harassed and discriminated against her based on their actions from February 2012 through March 2013, although Plaintiff claims the harassment has extended through the time after Plaintiff filed her EEO charges, and includes the issuance of a "baseless letter of warning" and a "baseless demand for another fact-finding interview" in May 2015.  Doc. 112, at 16, n.1.

The above constitutes Defendant's section on "undisputed facts." Plaintiff does not dispute these facts because for some reason, Defendant has chosen to present facts that have nothing to do with merits of Plaintiff's hostile environment claim. Oddly enough, the material facts that are relevant to this lawsuit are not presented by Defendant, but instead are contained in Plaintiff's eleven-page presentation of "additional facts."  The Court sets out these facts below as well as Defendant's responses to Plaintiff's additional facts.  Based on the evidence the Court has seen thus far, the Court may have been able to grant summary judgment to Defendant, but that option is foreclosed because Defendant has not provided the type of relevant substantive facts that a movant must provide in a motion for summary judgment.  *See Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (*moving party* "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of *material fact* and entitlement to judgment as a matter of law") (emphasis added).

By avoiding the substantive facts of a prima facie claim in its presentation of "undisputed" facts, Defendant has painted itself into a corner and has effectively precluded the Court from granting it summary judgment.   The Court cannot grant summary judgment to Defendant on the undisputed facts set forth in Defendant's motion because those facts are irrelevant to the a prima facie case of a hostile work environment claim.   They describe Plaintiff's allegations but fail to address any of the facts related to the alleged conduct which would support Defendant's contention that this conduct was either not motivated by gender, or was not severe or pervasive.[2]   On the other hand, once Plaintiff presented the material facts of her hostile environment claim in the response, the best Defendant could do was present evidence to dispute those facts in a reply, which in turn requires the Court to deny summary judgment. *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co*., 407 F.3d 1091, 1111 (10th Cir. 2005) (disputes of material fact preclude entry of summary judgment) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).   For these reasons, this motion was a waste of time and resources for the parties to prepare for the Court to address.

In the following sections, the Court describes Plaintiff's additional facts and the evidence presented by Defendants which creates material factual disputes but which, unfortunately, does not entitle Defendant to summary judgment.

A.      December 2012 to February 2013 (including first medical leave), Facts 1-23

On January 30, 2012, Plaintiff initiated an EEO charge against Flores alleging race, color, sex discrimination and harassment stemming from Flores' verbal threats and repeated and unfounded investigative "interviews."   Plaintiff rescinded that charge on February 13, 2012 after Arizona District Manager John DiPeri ("DiPeri") negotiated a resolution of the charges on February 13, 2012. On March 6, 2013, Plaintiff filed another EEO Charge, alleging race, color,

---

[2]  Five out of fourteen of the "undisputed facts" presented by Defendant recite Plaintiff's allegations.

sex, and age discrimination and harassment, and retaliation based on prior EEO Activity. Plaintiff claims that Flores knew about the charges of discrimination brought against him through the EEO counselor and because he was told by DiPeri. Defendant does not deny that charges were brought or that Flores came to know of these charges, but contends (correctly) that evidence of prior protected activity is not material to Plaintiff's claims of gender harassment and is properly addressed in Defendant's motion regarding Plaintiff's claims of retaliation. *See* Doc. 68.

Plaintiff's Facts 3 to 11 describe certain conduct by Flores directed toward Plaintiff:

- In her May 2013 EEO charge (Ex. B), Plaintiff stated that on Sunday, December 16, 2012, Flores called her at home yelling at her and told her that if she had any early starts the next day, she would be fired.[3]

- Between October 2012 and May 2013, Mr. Flores imposed three (3) investigative interviews, also known as "fact-findings" on Plaintiff in five (5) weeks, refused any explanation of the results, sarcastically stated that he didn't want to "ruin" her holiday season, and did not tell her the results of the fact-finding up to the date of her EEO Affidavit. A fact-finding interview is part of the disciplinary process that includes a written notice of alleged deficiencies, the opportunity to have a representative present, and the potential for discipline.

- Plaintiff also stated in her EEO charge that Mr. Flores used the fact-finding process to repeatedly threaten Plaintiff's job and ruin her reputation by parading her into his office for baseless fact-finding interviews. Plaintiff was "yelled at" and she felt "belittled" and disrespected" because Flores discussed her personal issues with other managers[4] and his staff. He brought in witnesses to sit in on fact-finding interviews discussing Plaintiff's performance. For instance, on November 5, 2012, Flores conducted a "business review" of Ms. Montano in the presence of a lower level manager, which was an unusual practice since Flores had conducted performance reviews in the past without witnesses.

- Flores did not issue discipline as a result of these interviews, but warned her that she could lose her job, and Plaintiff contends that Flores "managed to ruin [her] reputation and ability for promotion." Plaintiff claims that Flores was "relentless" in trying to find a

---

[3] There is no description concerning the significance of "early starts" in the context of postal delivery, but from the pleadings, the Court assumes it means allowing postal workers outside allowable time constraints.

[4] The Court uses "manager" and "supervisor" interchangeably, since both are used in the pleadings.

basis for disciplining Plaintiff, for humiliating her and for trying to ruin her reputation and discredit her.

Defendant generally denies these facts, but provides no affidavit from Flores or any other individual stating that the fact-finding interviews and yelling at Plaintiff did not occur.[5]  Without any evidentiary support for Defendant's denial, the Court must accept these facts as undisputed in that this conduct as described by Plaintiff did in fact occur.  In response to Plaintiff's Facts 3-11, Defendant also contends that these facts are not evidence of any sufficiently adverse employment action, nor do they describe a sufficiently severe and pervasive work environment to constitute a basis for Plaintiff's claims.

In December 2012, Plaintiff applied for a position in Coppell, Texas, but she was not interviewed for the job.  Plaintiff states that Flores was aware of her application based on the common practice for postal executives to speak to each other about pending applications.  Defendant observes there is no evidence, except for Plaintiff's conclusory assertions, that Flores communicated with the hiring officer for that position, District Manager Julie Gosdin.  Ms. Gosdin testified that she was not aware of Plaintiff's race, color, age or prior EEO activity, but made the hiring decision based on Plaintiff's professional qualifications as compared to other applicants.  Ex. 2 (Gosdin Aff).  Also, according to her own testimony, Plaintiff had "no knowledge" of whether Flores actually communicated about the hiring decision with Gosdin.  Ex. C p. 145 at 20-23.

On January 28, 2013, Mr. Flores accused Plaintiff of not managing her station.

In January 2013, Plaintiff claims that Flores failed to respond to Plaintiff for several weeks regarding her request for leave to attend a work-related Legislative Forum.  Defendant

---

[5]  Defendant generally "denies" Plaintiff's facts, which is incongruous with summary judgment procedure, where the opponent's facts must be "disputed" with supporting evidence, and so the Court assumes these "denials" as "disputes" where Defendant provides factual support.

disputes this fact (Pltff's Fact No. 14) because Plaintiff's evidence does not support this claim. Exhibit K is an e-mail which establishes only that Plaintiff asked by email on January 5, 2013 and again on January 11, 2013 for time off to attend the meeting which would be held February 1-7, 2013. Exhibit K states that Plaintiff "need[s]" a response on this," but there is no indication that the response was long in coming, or the length of any delay in the response. Also, Plaintiff did attend the meeting for the dates requested.

Plaintiff's Facts Nos. 15-22 concern Flores' demand that Plaintiff provide additional medical documentation for FMLA leave which Plaintiff took from January 1-7, 2013. On February 8, 2013, Flores called Plaintiff and told her to go home and not return until she brought medical documentation because the nurse felt that more documentation was needed. Plaintiff offered to bring this documentation the following week after she saw her doctor, but Flores insisted she leave work that day until she obtained another medical release. Plaintiff states that the following day, the Coronado post office was to be evaluated by a "dream team," a group of lower level postal workers, and that Flores ordered her to go home as a pretext to have her absent for the evaluation. Plaintiff feels that Flores' actions impugned her professionalism as the Postmaster of Santa Fe and considers it harassment that he brought in the "dream team" on a day he knew she would be out of the office. Ex. G at 153-154. She also contends that it was unnecessary for Flores to send her home for a medical release because when she returned to work on January 15, 2015 (26 days before Flores demanded additional documentation), she had an FMLA release that had been approved by an agency FMLA specialist. Ex. G. Plaintiff later found out from Nurse Gronkowski that the request for additional medical documentation came from Flores and not from her, which suggested to Plaintiff that Flores had misrepresented the facts regarding the requirement for additional medical documentation.

Defendant does not dispute Flores' request for additional medical documentation, but denies that Flores intended to get Plaintiff out of the office when the audit team started their evaluation of the post office. The evaluation had been initially set for the first day Plaintiff was to return from her medical leave. However, as a Level 24 Postmaster and former Level 25 MPOO,[6] Plaintiff was familiar with medical documentation requirements, including a Form 3971 which Plaintiff had not submitted. *See* Ex. 3 (Roark Dep.) at 97:20-98:1-8.[7] The Court finds that these responsive facts create a material factual dispute concerning the basis for Flores' demand that Plaintiff provide additional medical documentation for her medical leave from January 1-7, 2013.

B.    Initial Management Inquiry Process ("IMIP")—March 2013 (Facts 23-27)

An IMIP interview was conducted March 2013. Plaintiff states that during the IMIP, the interviewer, Regina Beckhum, would not allow her to speak about Mr. Flores' mistreatment. From the questions she was asked, it was not clear whether Plaintiff was the accused harasser, and so Plaintiff felt that she was "being set up" and "was an emotional wreck at that time." Ex. C at 163, 165. Plaintiff notes that she had requested an IMIP or intervention seven months earlier (in August 2012), but John DiPeri told her through a Human Resource ("HR") Manager that she needed to "read a book on how to communicate with your boss." Ex. C at 119.

Defendant disputes Plaintiff's legal conclusions that the interview was wrongfully conducted, pointing out that Ms. Beckhum was tasked by HR with conducting an IMIP with Plaintiff and at first did not know whether Plaintiff was the harasser or the harassed individual.

---

[6] Defendant's pleading refers to a "POOM," and for "MOOP," for which the Court can find no description, and thus assumes it is a typographical error for what was intended to be "MPOO." *See* Doc. 116 at 5.

[7] One of the exhibits submitted by Plaintiff is a copy of the notes taken during a meeting between Plaintiff and HR. In these notes, the interviewer states that the FMLA information did not release Plaintiff to return to work and that additional documentation was necessary to protect the postal service from liability and against a possible charge that she was allowed to return to work too early. Ex. E at 18.

Also, despite Plaintiff's claim that Ms. Beckhum prohibited her from discussing prior harassment, Ms. Beckhum's interview notes clearly show that Plaintiff described and detailed her perceived pattern of harassment extending as far back as 2011 through 2012.  Ex. E at 4-10. The Court finds that Defendant's responses to Plaintiff's Facts 23-24 and supporting evidence pose material disputes regarding Plaintiff's interpretation of her IMIP meeting.

The USPS Policy of Workplace Harassment requires any manager who receives a complaint to "see that a prompt and thorough investigation is conducted."  Ex. D.  In the IMIP, USPS HR found that "[b]ased upon the initial inquiry, the allegations raised by Ms. Montano are subjective and appear to be related to organizational issues.  A hostile working environment has not been demonstrated."  Ex. E at 2.

C.      Supervision Under Trujillo (Facts 27-31)

Plaintiff claims that Humberto Trujillo ("Trujillo"), who was Plaintiff's supervisor from March to the beginning of July of 2013, arbitrarily directed her to impose on her staff fact-findings, regardless of who she gave them to.  On May 29, 2013, Trujillo sent Plaintiff an email with the mandate to turn in a minimum of 10 fact-findings and 5 corrective action packages by Friday. Ex. O.[8]  Defendant denies that Plaintiff was ordered to impose fact-findings on her staff arbitrarily, and that Plaintiff's own exhibit shows that Trujillo's directive was specifically aimed at addressing excessive use of Penalty Overtime ("POT") by the Santa Fe stations, an issue that had persisted over the course of more than one week:

> Of the 47 hours of POT used yesterday Santa Fe had 23 of those hours. Main 8 hours and Coronado 15.  What actions were taken for yesterdays [sic] performance? . . . Where is the corrective action from last weeks over runs? I should have a  minimum of 10 FF [fact-findings] and 5 corrective action packages by Friday . . . .

---

[8]  In her deposition, Plaintiff described a fact-finding as an investigative interview taken to a formal state , and that by the time a fact-finding was done, the person "was pretty much in trouble."  Ex. C at 41:7-9.

Ex. O.  Thus, Defendant demonstrates that Trujillo had a legitimate business reason for inquiring

into the corrective action she intended to take to address the problems with her staff.  The Court

agrees that this evidence effectively counters Plaintiff's conclusory statement that she was

ordered to arbitrarily impose fact-findings on her staff.

        In Fact No. 31, Plaintiff states that Trujillo repeatedly threatened to fire her and that this

made her ill:

> . . . I talked to Trujillo. I told him, Why are you doing this? Every time I talk to
> you, you threaten to fire me every single day. In fact, I emailed him and I said,
> What do you want from me? You embarrass me in front of [Postmaster] Billy
> Smith. He said, If you don't do what I say, I'm going to fire you. And Trujillo's
> answer was, You just listen to what I say. You just better do what I say or I'm
> going to fire you. And he said it so many times. . .
> . . .
> . . . I talked to my staff that I was getting sick. Every time they [Flores and
> Trujillo] would come over, I would throw up in the bathroom. . . And  I realized
> that it was not going to get better, the harassment, the belittlement, the campaign
> against me, the discrimination because of my race, being sick all the time. . . .[9]

Ex. C at 128-129.  Defendant disputes that Trujillo threatened to fire Plaintiff, pointing out that

Plaintiff's second EEO claim asserts a general pattern of harassment between November 21,

2012 and January 28, 2013, but Trujillo did not become her supervisor until April or May of

2013.[10]  Ex. 5 (Trujillo Dep.) at 29-30.  The Court finds that a dispute exists on this fact

concerning the frequency of Trujillo's repetitive threats to fire her because of the undisputed

timeline, but there is no reference to any statement by Trujillo that these threats did not in fact

occur.

        D.      <u>Medical Leave of Absence June-July 2013 (Facts 32-36)</u>

---

[9]   The complaint in this case alleges a Title VII violation only on the basis of gender harassment and retaliation, not race.

[10]   In its response to Plaintiff's Fact No. 31 and 32-34, Defendant makes a vague reference to non-exhaustion of certain issues, without any explanation or argument on what is specifically not exhausted, or why.

Plaintiff states that Trujillo required her to work during her medical leaves of absence. On June 10, 2013, while Plaintiff was on medical leave, Trujillo sent her an email that she was to report for a fact-finding in 15 days concerning her "failure to follow instructions." Ex. L. Plaintiff explained that she was on sick leave. That evening, Trujillo sent Plaintiff another email stating that regardless of her sick leave, "you are on call 24/7 as a Postmaster," and that "You were issue a USPS phone for this purpose. . . ." Ex. M. About two weeks after Plaintiff went on sick leave, Trujillo requested that she attend another fact-finding, or investigative, interview. On June 6, 2013, while Plaintiff was on sick leave, Trujillo issue Plaintiff a Letter of Warning ("LOW") evaluation purportedly due to a suspense that had not been completed the prior month; however, the suspense had been completed. Ex. P. Defendant notes that the LOW that was issued did not result in any negative effects on Plaintiff's employment.[11]

In July, 2013, during Plaintiff's FMLA leave, Trujillo ordered that Plaintiff turn in her equipment. At that time, Plaintiff was using an issued USPS Blackberry and laptop to perform regular supervisory duties, including approval of travel expenses, purchases for supervisors, and review of business-related emails, including emails from Trujillo. Ex. I.

Defendant denies that Plaintiff was on "medical leave of absence" in June 2013, noting that Plaintiff's own exhibits make it clear that Plaintiff took sick leave without notifying her supervisor or submitting the proper paperwork, provided her supervisor no indication that she intended to be out long term, and also failed to notify her supervisor of efforts to ensure that her stations were properly covered. Exhibit M is an email sent by Trujillo to Plaintiff wherein

---

[11]   It is not clear from the pleadings what is meant by a "suspense" or "suspense item." *See* Pltff's Facts 32 & 33. Also, the Court rejects Defendant's contention that Ex. P, which is an email from Plaintiff to an EAP consultant, is inadmissible hearsay and unsubstantiated. However, at the summary judgment state, evidence need not be submitted in a form that would be admissible at trial as long as the substance of the evidence is admissible. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). The substance of the evidence in Exhibit P is information that is within Plaintiff's personal knowledge, and so is admissible for summary judgment purposes.

Trujillo reminds Plaintiff of discussions on May 20, 2013 and May 28, 2013 about the need to request time for doctor appointments by submitting Form 3991, or at least calling him personally to request sick leave.  In that email, Trujillo noted that he did not receive any call from Plaintiff requesting such leave, and unless she did so, she was assumed to be on call 24/7 as a Postmaster. Exhibit L is a follow up to this issue, in which Trujillo informed Plaintiff that the fact-finding concerned her "failure to follow instructions."  Also, Trujillo stated that he required Plaintiff's Blackberry and laptop in order to prevent Plaintiff from working once he knew that her FMLA leave was indefinite and that her leave was predicated on stress from her work at the postal service.  Ex. 5 at 166.  The Court finds that this evidence amply disputes Plaintiff's statement that Trujillo expected her to work during her medical leave of absence, and also is evidence that her leave was not authorized through the postal service, at least initially.[12]

On May 26, 2015, during her extended FMLA leave, Mr. Flores demanded that Plaintiff attend another fact-finding interview, which Plaintiff states she found to be harassing and baseless.

E.      Remaining Facts (Facts 37-52)

Most of Plaintiff's remaining facts are more legal argument than facts, stating for example that Trujillo's fact-finding interviews were just another example of harassment, and that she suffered stress, anxiety and depression from the work harassment.  Pltff's Facts 37-38. Several are based on emails to which Plaintiff was not a party, such as an email from the HR manager to John DiPeri noting that Flores had remarked in a conversation with the Coronado station manager that Plaintiff should take a "Yas pill."  Ex. BB.  Plaintiff cannot rely on such evidence to have contributed to the feeling of a hostile work environment where she did not

---

[12] Defendant suggests that certain claims are not exhausted, without describing what those claims might be, and why those claims are not exhausted.  *See, e.g.,* Deft's Resp. to Pltff's Facts 32-34.

perceive the conduct in the first place. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 91993 (if victim does not subjectively perceive the environment to be abusive, then the conduct has not altered the conditions of employment).

It is undisputed that Trujillo did tell Plaintiff that her post office was the worst in the district. Ex. T at 80. He also described her post office as the "eyesore of the district" and in an email to both Plaintiff and Erik Setter, Plaintiff's manager at the post office where she worked, stated that the both of them "should be embarrassed" and wondered about the "corrective action for overruns. . . ." Ex. T at 97:22-25.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

## DISCUSSION

Title VII's prohibition against sex discrimination includes a ban on sexual harassment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986).   Discriminatory harassment, however, is actionable only if it is pervasive or extreme, amounting to a change in the terms and conditions

of employment and creating a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 778 (1998); *see also, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, (1998); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).  In order for a hostile environment claim to survive summary judgment, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quotation omitted).

To evaluate whether a working environment is sufficiently hostile or abusive, a court must examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.  *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 23 (1993). ).   In addition, the environment must be both subjectively and objectively hostile or abusive. *Id*.; *see also Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998). But severity and pervasiveness are not enough. The "plaintiff must produce evidence that she was the object of harassment  because of her gender." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998). (emphasis added). [from original].  In short, a hostile environment claim requires a showing of severe and pervasive harassment that is based on gender.

I.    **Discrete Acts**

Defendant first argues that Plaintiff's claims fail to the extent they are based on alleged acts of disparate treatment set forth in Plaintiff's EEO charges.  Disparate treatment and hostile work environment claims are separate and distinct causes of action designed to redress different

forms or discrimination in the work place, each having different elements of proof.  *Nat'l R.R. Passenger v. Morgan*, 536 U.S. 101, 103 (2002). Disparate treatment claims are designed to redress discrimination relating to employment decisions such as hiring and firing, compensation and other terms or conditions of employment. Hostile work environment claims, on the other hand, are designed to redress non-traditional forms of discrimination that pollute the emotional and psychological environment of the work place, ultimately altering the conditions of employment. *Meritor Savings Bank F.S.B. v. Vinson*, 477 U.S. 57, 64-67 (1986).

While the EEO charge does mention the occurrence of fact-finding interviews which Plaintiff found to be harassing and demeaning, the charge also describes these interviews as occurring more than once or twice and alleges that they were held on the pretext of belittling her and in an effort to ruin her professional reputation.  Ex. B at 3.  The other alleged acts include being yelled at, belittled, and disrespected by "degrading" comments made by her manager. While the EEO charge also asserts that she was not selected to interview for a certain MPOO level 25 job, and that her manager refused to approve her leave request to attend the League Postal Forum,[13] these discrete acts are not really part of the foundation of Plaintiff's hostile work environment claim.  While there is a danger of blurring discrete acts of disparate treatment and hostile work environment claims, Plaintiff here alleges a series of repeated and episodic acts that occurred over a series of months, and thus has sufficiently alleged a hostile environment claim rather than disparate treatment.  *See AMTRAK v. Morgan,* 536 U.S. 101, 114-18 (2002) (hostile environment claims are different in kind from discrete acts in that their very nature involves repeated conduct. The issue here is whether the alleged conduct rises to the level of a Title VII violation.

---

[13]   It appears that the League Postal Forum was held in March of 2013, *see* Doc. 112 at 15, as opposed to the Legislative Forum which Plaintiff attended in early February 2013.

## II.      Gender Motivation

Defendant next contends that Plaintiff cannot establish that any of Flores' or Trujillo's actions were motivated by Plaintiff's gender. *See Gross v. Burggraf Construction Co*., 53 F.3d 1531, 1546 (10th Cir. 1996) (if nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc*., 19 F.3d 533, 538 (10th Cir.1994).

In her complaint, Plaintiff asserts that Flores made comments to her that she was not the typical Hispanic woman who is shy and complacent," that Plaintiff was "too smart and sure of [herself], and that he did not like her male personality.  Compl., ¶ 36.  Flores would also complement Plaintiff's hair, shoes and clothing when in front of other employees, which made her uncomfortable and also state that she was too aggressive and acted like a man.  *Id.,* ¶39.  In her response to this motion for summary judgment, however, Plaintiff does not mention any of these comments, much less provide evidence to support them.   Instead, Plaintiff relies on testimony by Robert Roark ("Roark"), who was the acting MPOO in the Tucumcari, New Mexico at the time of the underlying incidents. Plaintiff contends that Roark testified that women were treated differently and less favorably than males; that Flores and Trujillo belittled and degraded female USPS employees; and that Trujillo treated Plaintiff in a belittling manner and yelled and screamed at her.  *See* Ex. U at 56-57, 62.

However, Plaintiff twists Roark's testimony to mean something it does not say.  Roark did state that Flores and Trujillo belittled other females in the postal service as well as Plaintiff (Ex. U at 56) by yelling and screaming, but when asked, he denied that Trujillo that Flores women were treated differently than men.  For example, he chalked up Trujillo's behavior to personality likes and dislikes.  Ex. U at 62:23-25 to 63:1 ("[Trujillo] definitely had people he

liked and didn't like.  If he didn't like you he treated you like crap.").  Favoritism exhibited by Trujillo or Flores is not in itself harassment without an impermissible motive.  *See Taken et al. v. Okla. Corp. Comm.,* 125 F.3d 1366 (10th Cir. 1997) (favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification. Plaintiff also considers Flores' mimicking her voice and tone and name-calling by Flores (that Plaintiff should take a "Yas Pill") as demeaning with a sexual connotation.  None of this evidence points to animosity towards Plaintiff based on her gender, despite Plaintiff's subjective description of the evidence.  *Cmp. Huffman v. City of Prairie Vill., Kan*., 980 F. Supp. 1192, 1201 (D. Kan. 1997) (holding that sexual epithets that a woman worker is a "whore" or a "bitch" are capable of making the workplace unbearable for the woman verbally so harassed). Further, while some of this behavior (such as the name-calling and mimicking) is certainly not appropriate for the workplace, it is also not meant to be remedied by Title VII, which targets Title VII, not incivility. *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (Title VII is not a code of workplace conduct, nor was it "designed to bring about a magical transformation in the social mores of American workers. . . .) (citing *Gross v. Burggraf Constr. Co.,* 53 F.3d 15331, 1538 (10th Cir. 2005)).

Defendant contends that the vast majority of complained-of behavior is not gender-related at all.  Plaintiff herself lists the offending conduct as follows:

(1)     Being yelled at by her manager and feeling belittled and disrespected when her manager made degrading comments about Plaintiff's work unit;
(2)     Being given fact-finding interviews in December and other dates;
(3)     Being sent home for additional medical documentation on November 21, 2012 and February 8, 2013;
(4)     Her manager's refusal to approve leave request to attend the League Postal Forum on January 5 and 11, 2013;
(5)      Her manager's refusal to approve Plaintiff's request to attend the League Postal Forum on March 1, 2013, her manager refused to approve her leave request to attend the League Postal Forum;

(6)     Being given a Harassment Interview in March 2013 ("IMIP") without being told the
        reason for the IMIP;
(7)     Being issued a Letter of Warning on June 6, 2013;
(8)     Removing Plaintiff's postal access "on an unspecified date"; and
(9)     On an unspecified date, she was given unreasonable expectations as a Postmaster.[14]

Plaintiff also claims that John DiPeri also subjected her to a hostile work environment when he emailed Plaintiff and her other supervisor, Erik Setter and called her "disappointing and disgraceful," and stated, "How long is it going to take for you to follow my instructions?"  These incidents, even when taken together, do not suggest these actions were taken based on hostility toward Plaintiff because of her gender rather than work-related criticisms, and Plaintiff offers no evidence of illegal motivation on the part of either Flores or Trujillo.  These incidents have been mentioned in Plaintiff's facts and have been cleanly rebutted by Defendant.  Defendant notes, for example, that the IMIP interview had been requested by Plaintiff herself, and that the HR person conducting the interview was not initially aware of Plaintiff's role in the situation.  While this confusion may have been a bit disconcerting to Plaintiff, Defendant has raised a dispute of fact as to whether it constitutes hostility toward Plaintiff based on her gender.  Defendant also offers legitimate work reasons for sending Plaintiff home for additional medical documentation for sick leave, and thus raises factual disputes on whether Plaintiff was treated unfairly because of her gender.

It is worth mentioning that what may have been driving the alleged animosity toward Plaintiff has more to do with Plaintiff's role in testifying in an investigation by the Office of Inspector General ("OIG") than her gender.   According to the Complaint, Plaintiff was subpoenaed to testify in 2011 about falsification of priority mail scores and this testimony was used to support OIG's findings against several high level USPS employees.  Compl., ¶103-104.

---

[14]  Plaintiff provides no explanation of the significance of either the "postal access" that was removed, or how this was motivated by gender animus; or what the "unreasonable expectations" were.

Plaintiff also complained to supervisor Matthew Lopez, who was the Albuquerque District Manager, that several managers were diverting City Carrier hours to other areas of operations, such as vehicle maintenance, in order to falsely show better efficiency scores. Flores was implicated in this alleged conduct. *Id.,* ¶105; Ex. B at 8. None of these allegations, however, are relevant to Plaintiff's hostile environment claim, although they would be relevant to Plaintiff's retaliation claim which the Court will address at a later time. For purposes of this motion, Defendant has presented evidence suggesting that actions or statements made by Flores or Trujillo were not based on Plaintiff's gender.

This is a case which involves a few comments that could be viewed as gender-related, but it is questionable as to whether these comments (which are fairly innocuous) can be used to reinforce or boost the gender-neutral conduct and statements, as occurred in *Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005). The plaintiffs in *Chavez* alleged a substantial amount of gender-neutral harassment in order to "bolster a smaller amount of gender-based conduct on summary judgment. *Id.* at 833. As gender-neutral conduct, plaintiffs alleged that male coworkers: never invited them to lunch; avoided any discussion of technical matters with female workers and were generally uncommunicative. One plaintiff was refused access to passwords that were necessary for her work; coworkers refused to explain important work projects to her, and a male coworker was permitted to attend a programming class from which the plaintiff was excluded. The Tenth Circuit reversed summary judgment granted to defendants by the trial court. The court found that the small amount of gender-related conduct could be used to boost the gender neutral conduct because the nature of the gender-related conduct had sufficiently poisoned the entire body of conduct toward plaintiffs to the point where a reasonable person

could view all of the allegedly harassing conduct, including gender-neutral conduct, as the product of sex and gender hostility.

However, *Chavez* appears to be distinguishable from this case because the gender-related comments in that case were substantive, and included physically sexual encounters directed by one of the defendants to each of the plaintiffs, such as: a sexual proposition in exchange for not issuing a reprimand letter; lewd staring at a plaintiff's breast while massaging his genitals; calling plaintiff a "fucking bitch" and other lewd comments. Defendants argue that the few comments directed at Plaintiff do not rise to the level where they can be used to bolster a connection to gender animus for the gender-neutral conduct, and the evidence presented by Defendant presents factual disputes on that question.

## III.   Severe and Pervasive Requirement

Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is "sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment." *Lockard v. Pizza Hut, Inc.* 162 F.3d 1062, 1071 (10th Cir. 1998) quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. at 67.

There is no "mathematically precise test" for determining whether the conduct is sufficiently severe or pervasive. *Harris v. Forklift Sys., Inc*., 510 U.S. at 22. Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Smith v. NW Fin. Acceptance Corp*., 129 F.3d 1408, 1413 (10th Cir. 1997); *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.2005)). ). Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is

severe and threatening. *See, e.g.*, *Lockard*, 162 F.3d at 1072 (allowing claim based on single incident).[15]  The concept of "pervasive" is not a counting measure.  Rather, the trier of fact utilizes a broader contextual analysis.  *Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, *1414 (10th Cir. 1997).

Plaintiff can survive summary judgment if she can show that evidence of the alleged conduct can be considered either severe *or* pervasive, *and* that the complained of conduct was carried out because of her gender.   Plaintiff may have been offended by the alleged gender-related comments, but the question is whether a reasonable juror would find the comments and conduct offensive.  *See., e.g., Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (finding evidence of offensive behavior and boorish comments insufficient to sustain hostile environment claim where supervisor habitually referred to plaintiff as "grandma," held to the idea that all intelligent women are unattractive, called each of plaintiff's female colleagues a bitch at least once, comments that female employee dressed "like a whore" and had been hired for her looks); *see also Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.2005) (a few isolated incidents of racial enmity or sporadic racial slurs insufficient to constitute harassing conduct) (quoting *Bolden v. PRC, Inc*., 43 F.3d at 551); *Gerald v. Locksley*, 849 F.Supp.2d 1190 (2011) (plaintiff must demonstrate a "steady barrage" of opprobrious racial comments.

In an effort to use evidence of harassment of others to support her hostile work environment claim, Plaintiff offers the affidavit of David Pratt, President of the National Association of Letter Carriers ("NALC") regarding Mr. Trujillo's denial of his right to work on

---

[15]  The plaintiff in *Lockard*, was a Pizza Hut waitress who alleged that her employer created a hostile environment by refusing to address the conduct of two male customers, who commented to plaintiff that she smelled nice, pulled her by the hair, grabbed her breast and placed his mouth on it.  162 F.3d at 1072.  The court found that while this was a one-time incident, the harassing nature of the conduct was severe enough to support the jury's finding that it created an actionable hostile work environment.

Union activities during work hours is neither material nor relevant to Plaintiff's claims of gender

harassment.  *See* Ex. R.  Incidents involving employees other than the plaintiff are relevant in

establishing a generally hostile work environment.  *See Hicks v. Gates Rubber Co.*, 833F.2d at

1415.  However, *Hicks* does not apply here because Pratt is male, and his statements refer to

discrimination based on his union activities.  Moreover, while hostile conduct directed toward

other members of a plaintiff's protected group (here, other females), the plaintiff must still show

that this conduct actually altered conditions of the particular plaintiff's employment.  *See, e.g.,*

*Leibovitz v. New York City Transit Auth.,* 252 F.3d 179 (2d Cir. 2001) (plaintiff's sexual

harassment claim eventually failed because she was unable to show that the harassment of her

co-workers altered the conditions of their working environment by making it hostile.[16]

     Plaintiff sorts the alleged harassing conduct as follows, and the Court adds its comments

on each of them:

(1)    Defendant's managers treating women differently from men.  This contention is based
largely on the yelling and screaming utilized by Flores and Trujillo.  While enduring this at work
would undoubtedly be unpleasant, the evidence presents a dispute as to whether any such verbal
abuse was directed at Plaintiff because she was a woman rather than because she was not
personally liked;

(2)    Belittling Plaintiff, for example Trujillo's statement to Plaintiff that her post office was
the "worst in the district."  These comments were directed at *both* Plaintiff and Erik Setter, who
is a male supervisor and these facts rebut Plaintiff's argument that Plaintiff was "belittled"
because of her gender.  Further, workplace criticism—even criticism that is direct and hurtful—
is not necessarily harassment under Title VII without meeting Title VII's other requirements of
severity and pervasiveness;

(3)    Repeatedly threatening to fire Plaintiff.  There is no evidence pinning down how many
times, or in what context, Plaintiff was threatened, and the severity or pervasiveness of this
conduct is undetermined, although there is no evidence that these threats were motivated in the
least by Plaintiff's gender or sex;

---

[16]  The Court notes that in *Hicks*, the Tenth Circuit also concluded that a trial court "may aggregate evidence of
racial hostility with evidence of sexual hostility" in determining the pervasiveness of the harassment against the
plaintiff who had made claims of both race and sex discrimination.  However, the court did not extend this finding to
include evidence of other kinds of harassment directed toward others.

(4)      Condoning improper behavior.  This conduct is based on Flores' sending Plaintiff home for additional medical documentation on the same day the "dream team" was scheduled to evaluate her post office.  Plaintiff's evidence that her FMLA paperwork may have been in order does not rebut evidence presented by Defendant that she had not complied with submission of the proper postal service medical forms before she took her sick leave.  This happened twice, and each instance involved an oversight or failure by Plaintiff to follow USPS leave requirements, which creates a dispute of fact as to whether these actions could be considered part of a hostile work environment directed at Plaintiff because of her gender;

(5)      "Dragging" Plaintiff into "baseless" fact-finding and harassment interviews.  Each of these fact-finding interviews are sufficiently documented as concerning Plaintiff's failure to comply with USPS regulations about medical documentation for sick leave, regardless of whether Plaintiff had met the paperwork requirements under FMLA.  The Court finds that the legitimate reasons given by Defendant for these interviews leaves a fact issue to be determined by a fact finder;

(6)      Calling Plaintiff names (taking a "Yas pill) and mimicking her voice.  Most, if not all, of this conduct took place outside of Plaintiff's hearing.  Even if Plaintiff was subjected to the name-calling and mimicking, the conduct is inappropriate for work and possibly childish, but Defendant has presented evidence rebutting Plaintiff's evidence that this behavior was motivated by gender animus;

(7)      Giving Plaintiff  "unreasonable expectations as a Postmaster" by mandating that Plaintiff issue fact-finding interviews to her staff.   While Plaintiff views this mandate as arbitrary, the actual evidence suggests that it was an effort to cut down the runaway use of overtime by some postal workers.

        Defendant's evidence, presented in response to Plaintiff's facts in its reply, suggests that the above alleged conduct is insufficient to meet Title VII's requirement that the alleged harassment be either severe or pervasive.  Much of the perceived harassment regarded Plaintiff's work performance and compliance with USPS sick leave documentation.  Plaintiff perceives the complained-of conduct as "harassing" or "abusive," but an environment must be considered *objectively* hostile as well as subjectively hostile to survive summary judgment.  Also, too few of the alleged conduct is gender-related, and most are not.  *See, e.g., Penry*, 155 F.3d at 1262-63 (finding that most of the alleged incidents of harassment were not gender-related, none constituted offensive touching, and that conduct was not severe or pervasive enough to create an

environment that a reasonable juror could find hostile and abusive).[17]   Whether a reasonable juror would consider this conduct offensive, or whether it is severe or pervasive enough to constitute a hostile work environment, is a question that now must be decided at trial.

The evidence also strongly suggests that what is driving Plaintiff's hostile environment claim is a personality clash between Plaintiff and her supervisors, Mike Flores and Humberto Trujillo which is two-sided, based on outside accounts.   HR manager, Lerene Wiley, noted that there was "constant digging between the two [Plaintiff and Flores]."   Ex. E at 30.   Ms. Wiley also noted that during a meeting with Plaintiff and Flores, Flores asked Ms. Wiley to look at an email from Plaintiff and when Plaintiff wanted to discuss a different item, the meeting "turned to [constant] bickering."   *Id.*   Also, in an email to DiPeri, Ms. Wiley noted that the observations of two witnesses who testified as part of the investigation into Plaintiff's hostile environment charge:

> Ms. Montano and Mr. Flores frequently make condescending comments to one another on telecons and during conversations.   These perceptions should be brought to the attention of Ms. Montano and Mr. Flores and they should be advised to find a way to communicate more professionally and without the use of condescending comments especially in the presence of others.

Ex. BB.   Personal dislike in itself is not a basis for a hostile environment claim.   *See, e.g., Mitchell v. ESPY*, 845 F.Supp. 1474, 1493 (D.Kan. 1994) (dislike is not a pretext for discrimination); *Rakovich v. Wade*, 850 F.2d 1180, 1192-93 (7th Cir. 1987) (generic dislike is not retaliation).   Defendant has presented evidence consistent with finding that actions taken by Flores and Trujillo were not based on Plaintiff's gender, and that the alleged conduct was neither sufficiently severe nor pervasive to alter Plaintiff's working conditions.

**CONCLUSION**

---

[17]   The comments that were made in *Penry* consisted of comments on wet dreams and plaintiff's exposed bra strap, that one of the female assistants allowed him to get into her drawers "anytime," and asking Penry what she was wearing under her dress. 155 F.3d at 1262-63.

The Court denies Defendant's motion for summary judgment.  Defendant has presented facts suggesting: (1)  that the alleged harassing conduct directed at Plaintiff was based on legitimate work reasons and not based on Plaintiff's gender, considering the totality of the evidence; and  (2) that despite Plaintiff's subjective perception of Flores' and Trujillo's conduct, a reasonable person would not perceive Flores' and Trujillo's conduct as sufficiently severe or pervasive to alter one's work environment.   Had Defendant presented this evidence in its motion instead of the reply, Defendant would have a good case for summary judgment on Plaintiff's hostile environment claim.  However, the best the Court can do here is note the substantive evidence presented by Defendant rebutting Plaintiff's claim of hostile environment, but ultimately the Court must deny summary judgment because Defendant, as the moving party, failed in its motion for summary judgment to make a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to summary judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment on Defendant's Motion for Summary Judgment on Plaintiff's Counts I and III **(Doc. 67)** is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____

UNITED STATES DISTRICT JUDGE