## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

———————————

YASMIN MONTANO,

      Plaintiff,

    v.                                      No. CV 14-0634 WJ/GJF

PATRICK R. DONAHOE,
Postmaster General,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON
## PLAINTIFF'S COUNTS II AND IV

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment on Plaintiff's Counts II and IV, filed on September 18, 2015 (**Doc. 68**).  Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is well-taken and, therefore, is GRANTED.

## BACKGROUND

This is an employment discrimination case in which Yasmin Montano ("Plaintiff" or "Montano") alleges discrimination and retaliation by her supervisors, Michael Flores ("Flores") and Humberto Trujillo ("Trujillo"). Trujillo temporarily replaced Flores as Plaintiff's supervisor from March to early July of 2013. Plaintiff also alleges a whistleblower claim under the ELM ("Employment Labor Manual") USPS ("United States Postal Service") Rule §666, et seq.  The Complaint alleges gender discrimination, harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. as follows:

    Count I           – Title VII sexual harassment against Flores;

| Count II | – Title VII retaliation against Flores; |
| Count III | – Title VII sexual harassment against Trujillo; |
| Count IV | – Title VII retaliation against Trujillo; |
| Count V | – Violation of USPS Labor Manual Rule §666.22 (Discrimination and Retaliation); and |
| Count VI | – Violation of USPS employee labor manual §666.22 (Whistleblower Protection Retaliation). |

Defendant denies Plaintiff's claims and that Plaintiff has been harassed or discriminated against. Defendant also denies that Plaintiff has been subject to retaliation, or that she has a private right of action to assert a claim under the ELM USPS Rule § 666, et seq. Defendant has moved separately for summary judgment on Plaintiff's claims for discrimination and retaliation based on her gender. See Doc. 68. The Court recently denied summary judgment to Defendant on Plaintiff's hostile environment claims in Counts I and III. (Doc. 120). This Memorandum Opinion and Order addresses only Plaintiff's Counts II and IV alleging retaliation against Flores and Trujillo.

## I.     Facts[1]

Plaintiff began work for the USPS in June 1985. She served as one of three Managers of Postal Operations ("MPOO") for nine years within the New Mexico District, overseeing Postmasters around New Mexico.[2] In 2010, the New Mexico District was consolidated into the Arizona District and Plaintiff's position was eliminated. Plaintiff was not selected for a MPOO position in the newly consolidated District. She was hired on July11, 2011 as the Postmaster of

---

[1] Facts are undisputed unless otherwise noted. Also, the Court will generally omit references to supporting exhibits because references are provided in the briefs. Plaintiffs' exhibits are presented in Doc. 115, which contains exhibits A through CC. Defendant's exhibits are contained in an appendix/supplement (Doc. 70).

[2] The pleadings also refer to "POOM," for which there is no explanation, and so the Court cannot determine whether "POOM" is a typographical error referring to "MPOO." See Doc. 113 at 10; 118 at 6.

Santa Fe, New Mexico, retaining her level 25 pay for a period of two years while serving in the level 24 Santa Fe Postmaster position.  Flores, who was Plaintiff's former fellow MPOO, was hired at the highest level (level 25), thereby assuming a supervisory position over Plaintiff. Plaintiff reported to MPOO Mike Flores while in the Santa Fe position. Plaintiff's claims of retaliation are based on conduct by either Flores or Trujillo.

    A.    <u>Defendant's Facts</u>

On January 30, 2012, Plaintiff initiated an EEO charge against Flores alleging race, color, sex discrimination and harassment stemming from Flores' verbal threats and repeated and unfounded investigative "interviews."  Plaintiff rescinded that charge on February 13, 2012. Plaintiff is not claiming damages based on any actions of Defendant and Flores based on sex discrimination or sex harassment prior to February 13, 2012.

On March 6, 2013, Plaintiff filed a second EEO charge alleging race, color, sex and age discrimination and harassment, and retaliation based on prior EEO activity.  Plaintiff amended the charge on April 22, 2013 and August 19, 2013.  The EEO charge, as amended, included eleven Claims, which are listed as follows:

    1. On October 31, 2012, she did not receive an interview for a position in Texas;

    2. Between November 21, 2012 and January 28, 2013, she was subjected to harassment to include but not limited to: she felt belittled, disrespected, yelled at, and her manager made degrading comments about her work unit;

    3. On December 22, 2012, and other date(s) she was given Fact-Finding Interviews;[3]

    4. On November 21, 2012 and February 8, 2013, she was sent home and told to bring medical documentation;

    5. On January 5and 11, 2013, her manager refused to approve her leave request to attend the League Postal Forum;

---

[3] A fact-finding interview is part of the disciplinary process that includes a written notice of alleged deficiencies, the opportunity to have a representative present, and the potential for discipline.

6. On March 1, 2013, her manager requested she submit a PS Form 3971 for the week of February 8, 2013, or he would enter her leave as LWOP;

7. On January 29, 2013, she received via email a non-recommendation for interview letter for the position of Postmaster of Albuquerque;

8. In March 2013, she was given a Harassment Interview, or Initial Management Inquiry Process ("IMIP") by HR and was not told the reason for the IMIP;

9. On June 6, 2013, she received a Letter of Warning;

10. On an unspecified date, her Postal access was removed; and

11. On an unspecified date, she was given unreasonable expectations as Postmaster.

Plaintiff did not request an EEO hearing, and a Final Agency Decision was issued on April 24, 2014, finding no evidence of discrimination, retaliation or hostile work environment. Exs. 4 & 5.

A "Requirement by Applicant Matrix" indicated that all candidates selected for interview for the Coppell position in Texas scored a total of 51 or higher, but Plaintiff was among the four applicants that scored 44 or lower. The Matrix for the Albuquerque Postmaster Position indicated that of the seven applicants, Plaintiff scored a 14, while four other applicants scored a 15 or higher.

Plaintiff asserts various incidents of harassment that occurred between November 21, 2012 and February 21, 2013.

Flores states that he did not harass Plaintiff or treat her differently than any other employees in his reports. Ex. 8 at 5-9.

The fact-finding interview on December 21, 2012 did not result in any disciplinary action.

4

The Employment Labor Manual ("ELM") requires that a Form 3971 (Request for Sick Leave) be submitted by Postmasters whose absence requires a leave replacement, or where the absence will be in excess of three days.   Ex. 9.   The ELM also requires that medical documentation be provided.   *Id.*   Plaintiff did not require Flores' approval for leave up to 32 hours.   Plaintiff therefore approved her own leave to attend the League Postal Forum conference. Ex. 7, EEO Aff.   Also, Plaintiff was not forced to take leave without pay for her absence the week of February 8.

The Initial Management Inquiry Process ("IMIP") held in March 2013 was conducted as part of the investigation instigated at Plaintiff's request for intervention.   Ex. 7 at 34.

The Letter of Warning Plaintiff received on June 6, 2013, was signed by MPOO Flores, citing violations of ELM Sections 665.13, 665.16 and 665.3.   Ex. 12.   As Acting MPOO, Trujillo told Plaintiff to give him her phone and other unspecified equipment to eliminate the temptation to work while she was on sick leave.   Ex. 13 (Trujillo Aff. At 4-5).

Plaintiff does not offer any material fact to dispute any of these facts, although she attempts to do so.   For example, Plaintiff claims that Postmasters are exempt from the need to submit a Form 3971 for sick leave.   However, Plaintiff cites to portions of the ELM which state that Postmasters *are* in fact required to submit a Form 3971 in two situations: when the absence of that individual requires a leave replacement, or where the absence will be in excess of three days.   It is also undisputed that Plaintiff's leave periods satisfied one or both of these situations. The Court therefore accepts all of Defendant's facts as undisputed.

B.   Plaintiff's Facts

Plaintiff offers her own set of facts closely detailing all the incidents which form the basis for her retaliation claims.   Because of the sheer number of facts (fifty-two), the Court categorizes

them chronologically and not necessarily according to Plaintiff's numbering, and also includes Defendant's responses with each of the facts for ease of reading.  Also, the Court omits those facts which are not material to the merits of Plaintiff's claims, for example, facts which go to the issue of damages, or statements that constitute legal argument or conclusions.  See, e.g., Doc. 113 at 10, Pltff's Fact 37.

      A.     <u>December 2012 to February 2013 (including first medical leave), Facts 1-21</u>

Plaintiff claims that Flores knew about the charges of discrimination brought against him through the EEO counselor and because he was told by Arizona District Manager John DiPeri ("DiPeri"), and Defendant does not deny that Flores came to know about these charges.

Plaintiff's Facts 3 to 11 describe certain conduct by Flores directed toward Plaintiff:

- In her May 2013 EEO charge (Ex. B), Plaintiff stated that on Sunday, December 16, 2012, Flores called her at home yelling at her and told her that if she had any early starts [by postal workers] the next day, she would be fired.[4]

- Between October 2012 and May 2013, Mr. Flores imposed three (3) investigative interviews, also known as "fact-findings" on Plaintiff in five (5) weeks, refused any explanation of the results, sarcastically stated that he didn't want to "ruin" her holiday season, and did not tell her the results of the fact-finding up to the date of her EEO Affidavit.

- Plaintiff also stated in her EEO charge that Mr. Flores used the fact-finding process to "repeatedly" threaten Plaintiff's job and ruin her reputation by parading her into his office for baseless fact-finding interviews.  Plaintiff was "yelled at" and she felt "belittled" and disrespected" because Flores discussed her personal issues with other managers[5] and his staff.  He brought in witnesses to sit in on fact-finding interviews discussing Plaintiff's performance.  For instance, on November 5, 2012, Flores conducted a "business review" of Plaintiff in the presence of a lower level manager, which was an unusual practice since Flores had conducted performance reviews in the past without witnesses.  Flores explained to Plaintiff that he wanted a witness for the interview because Plaintiff had filed EEO charges and he was going to make sure he wrote down what was said and what their expectations were.  Ex. C at 151.

---

[4] There is no description concerning the significance of "early starts" in the context of postal delivery, but from the pleadings, the Court assumes it means allowing postal workers outside allowable time constraints.

[5] The Court uses "manager" and "supervisor" interchangeably, since both are used in the pleadings.

- Flores did not issue discipline as a result of these interviews, but warned her that she could lose her job, and Plaintiff contends that Flores "managed to ruin [her] reputation and ability for promotion." Plaintiff claims that Flores was "relentless" in trying to find a basis for disciplining Plaintiff, for humiliating her and for trying to ruin her reputation and discredit her.

Plaintiff's Facts 40-52 consists of a list describing Flores' conduct, which the Court assumes forms part of the basis for Claim 2 in Plaintiff's EEO charge, which states that between November 21, 2012 and January 28, 2013, Plaintiff was "yelled at," "belittled" and "disrespected." Plaintiff claims that Flores "patronized" her, calling her "Yas" and "Yazzie" to other postmasters, although not directly to her, and mimicked her voice when not in her presence by raising the pitch of his voice to a "very high-pitched victim-type voice." Ex. U (Roark Dep.) at 15; Ex. BB.

Defendant presents no evidence to refute these facts, although the Court realizes one cannot refute what another's subjective perception is. Defendant also contends that these incidents do not rise to the level of an adverse employment action.

In December 2012, Plaintiff applied for a position in Coppell, Texas, but she was not interviewed for the job. She claims that Flores was aware of her application based on the common practice for postal executives to speak to each other about pending applications. Defendant points out that there is no evidence that Flores communicated with the hiring officer for that position, District Manager Julie Gosdin, and offers Plaintiff's own testimony that Plaintiff had "no knowledge" of whether Flores actually communicated about the hiring decision with Gosdin. Ex. C p. 145 at 20-23. Defendant also disputes this fact by offering the testimony of Ms. Gosdin that she was not aware of Plaintiff's race, color, age or prior EEO activity, but made the hiring decision based on Plaintiff's professional qualifications as compared to other applicants. Ex. 2 (Gosdin Aff).

In January 2013, Plaintiff claims that Flores failed to respond to Plaintiff for several weeks regarding her request for leave to attend a work-related Legislative Forum.  Defendant disputes this fact (Pltff's Fact No. 14) because Plaintiff's evidence does not support this claim. Exhibit K is an e-mail which establishes only that on January 5, 2013 and again on January 11, 2013, Plaintiff asked for time off to attend the meeting which would be held February 1-7, 2013. Exhibit K states that Plaintiff "need[s]" a response on this," but there is no indication that the response was long in coming, or the length of any delay in the response.  Also, it is undisputed that Plaintiff did not actually require Flores' approval for taking this leave, and did attend the meeting.

Plaintiff's Facts Nos. 15-21 concern Flores' demand that Plaintiff provide additional medical documentation for FMLA leave which Plaintiff took from January 1-7, 2013.  On February 8, 2013, Flores called Plaintiff and told her to go home and not return until she brought medical documentation because the nurse felt that more documentation was needed.  Plaintiff offered to bring this documentation the following week after she saw her doctor, but Flores insisted she leave work that day until she obtained another medical release.  Plaintiff states that the following day, the Coronado post office was to be evaluated by a "dream team," a group of lower level postal workers, and contends that Flores ordered her to go home as a pretext to have her absent for the evaluation.  Plaintiff feels that Flores' actions impugned her professionalism as the Postmaster of Santa Fe and considers it harassment that he brought in the "dream team" on a day he knew she would be out of the office.  Ex. G at 153-154. She also contends that it was unnecessary for Flores to send her home for a medical release because when she returned to work on January 15, 2015 (26 days before Flores demanded additional documentation), she had an FMLA release that had been approved by an agency FMLA specialist.  Ex. G.  Plaintiff later

8

found out from Nurse Gronkowski that the request for additional medical documentation came from Flores and not from her, which suggested to Plaintiff that Flores had misrepresented the facts regarding the requirement for additional medical documentation.

Defendant does not dispute that Flores made the request for additional documentation and that Plaintiff was sent home until she complied, but denies that Flores intended to get Plaintiff out of the office when the audit team started their evaluation of the post office. The post office evaluation had been initially set for the first day Plaintiff was to return from her medical leave. However, as a Level 24 Postmaster and former Level 25 MPOO, Plaintiff was familiar with medical documentation requirements, including a Form 3971 which Plaintiff had not submitted. See Ex. 3 (Roark Dep.) at 97:20-98:1-8. While Plaintiff claims that Flores' request was unnecessary because she had a FMLA release, she does not dispute that USPS regulations required her as a Postmaster to submit a Form 3971 for the leave she had taken, nor does she dispute Defendant's claim that she had not submitted this form as required under ELM.

     B.    <u>Initial Management Inquiry Process ("IMIP")—March 2013 (Facts 22-27)</u>

An IMIP interview was conducted March 2013. Plaintiff states that during the IMIP, the interviewer, Regina Beckhum, would not allow her to speak about Mr. Flores' mistreatment. From the questions she was asked, it was not clear whether Plaintiff was the accused harasser, and so Plaintiff felt that she was "being set up" and "was an emotional wreck at that time." Ex. C at 163, 165. Plaintiff does not dispute that the IMIP was conducted as part of the investigation that she herself had requested, but she notes that when she had initially requested the intervention several months earlier, DiPeri told her through a Human Resource ("HR") Manager that she needed to "read a book on how to communicate with your boss." Ex. C at 119.

Defendant denies that the interview was wrongfully conducted, pointing out that Ms. Beckhum was tasked by HR with conducting an IMIP with Plaintiff and at first did not know whether Plaintiff was the harasser or the harassed individual. Also, despite Plaintiff's claim that Ms. Beckhum prohibited her from discussing prior harassment, Ms. Beckhum's interview notes show that Plaintiff described and detailed her perceived pattern of harassment extending as far back as 2011 through 2012. It is clear from these notes that there was no confusion on Ms. Beckhum's part that she was investigating Plaintiff's claims of harassment—and not that Plaintiff was the accused harasser. Ex. E at 4-10.

The USPS Policy of Workplace Harassment requires any manager who receives a complaint to "see that a prompt and thorough investigation is conducted." Ex. D. In the IMIP, USPS HR found that "[b]ased upon the initial inquiry, the allegations raised by [Plaintiff] are subjective and appear to be related to organizational issues. A hostile working environment has not been demonstrated." Ex. E at 2.

C.   Incidents Occurring after March 2013[6]

Plaintiff contends that Defendant minimized her authority and position at work. Plaintiff received an email from DiPeri on March 28, 2013, calling her "disappointing and disgraceful." The Court notes that although Plaintiff represents this as an email directed to her, it was actually addressed to *both* her and Erik Setter, her immediate supervisor, and concerned a failure to serve Santa Fe customers. Ex. X ("Erik and Yasmin. This is a totally unacceptable shop. Disappointing and disgraceful. How long is it going to take for you to follow my instructions?"). Then, on July 1, 2013, Trujillo emailed DiPeri regarding alleged problems with Plaintiff, stating that he had "concerns and frustrations" about her.

---

[6]  Plaintiff does not specify in the complaint whether she is basing her lawsuit on retaliatory conduct following the filing or her first or second EEO charge (which was filed on March 6, 2013)—or both. The Court analyzes the claim as to both EEO charges, since the alleged incidents span that time frame.

On May 26, 2015, during Plaintiff's extended FMLA, Flores demanded that Plaintiff attend another fact-finding interview, but Defendant's counsel intervened to stop the interview. Defendant contends that this was a routine letter sent at the direction of HR on the issue of Plaintiff's failure to provide the necessary medical documentation to substantiate her failure to return to work, even after one year.

Plaintiff claims that Trujillo told her that her post office branch was the "worst in the district" and that she should be "embarrassed." Trujillo also told Plaintiff that she showed a "lack of respect" for his instructions and felt that Plaintiff was deliberately refusing to follow his instructions. Ex. T at 112. Defendant does not dispute that Trujillo made these statements.

Plaintiff claims that Trujillo, who supervised Plaintiff from March or April to the beginning of July of 2013, arbitrarily directed Plaintiff to impose on her staff fact-findings, regardless of who she gave them to. On May 29, 2013, Trujillo sent Plaintiff an email with the mandate to turn in a minimum of 10 fact-findings and 5 corrective action packages by Friday. Ex. O. Defendant disputes that Plaintiff was ordered to impose fact-findings on her staff arbitrarily, and that Plaintiff's own exhibit shows that Trujillo's directive was specifically aimed at addressing excessive use of Penalty Overtime ("POT") by the Santa Fe stations, an issue that had persisted over the course of more than one week:[7]

> Of the 47 hours of POT used yesterday Santa Fe had 23 of those hours. Main 8 hours and Coronado 15. What actions were taken for yesterdays [sic] performance? . . . Where is the corrective action from last weeks over runs? I should have a minimum of 10 FF [fact-findings] and 5 corrective action packages by Friday . . . .

Ex. O.

Plaintiff states that Trujillo repeatedly threatened to fire her. Defendant disputes that Trujillo threatened to fire Plaintiff but does not offer any evidence to counter Plaintiff's

---

[7] There is no explanation in the pleadings describing "Penalty Overtime."

assertion, and also points out that while Plaintiff's second EEO claim asserts a general pattern of harassment between November 21, 2012 and January 28, 2013, Trujillo did not become her supervisor until April or May of 2013.

Plaintiff states that Trujillo required her to work during her medical leaves of absence. On June 10, 2013, while Plaintiff was still on medical leave, Trujillo sent her an email stating that she was to report for a fact-finding in 15 days concerning her "failure to follow instructions." Ex. L.  Plaintiff told him that she was on sick leave.  That evening, Trujillo sent Plaintiff another email stating that regardless of her sick leave, "you are on call 24/7 as a Postmaster," and that "You were issued a USPS phone for this purpose. . . ."  Ex. M.  In that email, Trujillo reminded Plaintiff of their discussions on May 20, 2013 and May 28, 2013 concerning the need to request time for doctor appointments either by submitting Form 3991 or calling Trujillo him personally to request sick leave.  *Id.*  Trujillo noted that he did not receive any call from Plaintiff requesting such leave, and unless she did so, she was assumed to be on call 24/7 as a Postmaster. *Id.*

Defendant disputes that Trujillo required Plaintiff to work during her medical leaves of absence, pointing out that the facts show that Plaintiff was not on authorized medical leave because she did not submit the proper paperwork, and also because she did not notify her supervisor to ensure that her stations were properly covered.  Defendant also provides evidence that once Trujillo knew that Plaintiff's FMLA leave was indefinite and that her leave was predicated on stress, he required Plaintiff to return her Blackberry and laptop in order to prevent her from working  and to assist in her recovery.  Ex. 5 at 166.

On June 6, 2013, while Plaintiff was on sick leave, Flores issued Plaintiff a Letter of Warning ("LOW") evaluation for failure to follow instructions regarding the timely completion

of a project called the "Scheduling and Staffing Tool" ("SST").  Defendant does not deny that

the LOW was issued but contends that it was not unfounded and observes that it did not result in

any negative effects on Plaintiff's employment. The LOW stated that Plaintiff offered no

"mitigating factors" which would relieve Plaintiff of her responsibility to complete the assigned

task and also noted that her excuses for failing to complete the project—that she did not have

access to a user password in order to work on the task—were misleading and inaccurate, since

access to the SST program was "universal and does not require a user password or higher level

approval."  Ex. 12.

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay

Chems., Inc*., 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the

evidence presented could allow a rational jury to find in favor of the nonmoving party.  *EEOC v.

Horizon/CMS Heathcare Corp*., 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the

facts in the light most favorable to the non-moving party and draw all reasonable inferences in

favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot

weigh the evidence and determine the truth of the matter, but instead determines whether there is

a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 243 (1986).

**DISCUSSION**

Defendant contends that Plaintiff has not exhausted all of the claims she presents to this

Court, and also that Plaintiff has not shown a prima facie case of retaliation or presented

evidence from which a reasonable factfinder could conclude there was a causal connection between Plaintiff's protected conduct and the alleged hostile environment.

The Court notes that in addition to requesting summary judgment on Plaintiff's retaliation claims, Defendant also moves for summary judgment on Plaintiff's disparate treatment claims, contending that Plaintiff cannot show either that Plaintiff suffered materially adverse employment actions, or that Defendant's actions were made with a discriminatory intent due to her gender.  Doc. 68 at 12.  Plaintiff correctly observes that issues related to discriminatory intent due to gender are not part of Plaintiff's allegations in Counts II and IV, but are more appropriately addressed in Plaintiff's hostile work environment claims in Counts I and III.  The Court therefore declines to entertain any argument or evidence on what Defendant construes as disparate treatment claims and addresses only Plaintiff's claims of retaliation which are set forth in Counts II and IV.

## I.      Exhaustion

Defendant claims that some of Plaintiff's claims are not exhausted under Title VII exhaustion requirement.  *Nat'l R.R. Passenger v. Morgan,* 536 U.S. 101, 103 (2002) (discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges); *Martinez v. Potter,* 347 F.3d 1208 (2003) (noting that *Morgan* effected changes in exhaustion doctrine where unexhausted discrete acts are no longer viable under the continuing violation doctrine).  Defendant argues that this lawsuit should be limited to the eleven claims that were submitted to the EEO process, and that Plaintiff seeks to expand the scope of her lawsuit to include allegations outside of her EEO claim.  Defendant also contends that many of Plaintiff's claims submitted as conduct forming a hostile work environment are actually discrete acts which are properly alleged as disparate treatment claims.

14

However, Defendant does not specify which of the claims presented in this lawsuit were not exhausted, and this Court does not intend to be picking through the mass of facts presented by Plaintiff to try and figure out which picayune incident Defendant might be characterizing as an unexhausted claim.   Also, Plaintiff presents these claims as part of a hostile work environment, based on her allegations of repetition of the same conduct, such as conducting multiple fact-finding interviews, insistence on additional medical documentation for her sick leave; and belittling her in front of other employees.   Unlike discrete claims alleging disparate treatment, hostile environment claims involve repeated conduct and thus do not require exhaustion for each alleged act, as long as at least *one* of the component actions was part of the charge filed within the limitations period.   *Davidson v. AOL, Inc.,* 337 F.3d 1179 (10th Cir. 2003) (citing *Morgan,* 536 U.S. at 103).   Thus, the Court finds that the eleven claims that were presented to the EEO, and which are now presented here, have been administratively exhausted.

## II.   Relevant Law

### A.   Title VII Retaliation

Title VII makes it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Section 2000e-2(a) lists actions that can constitute discrimination, specifying a refusal to hire, a discharge, or any discriminatory treatment with respect to "compensation, terms, conditions, or privileges of employment."   The three-pronged burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), applies to Plaintiff's claims here.   In the absence of direct evidence, a prima facie case of retaliation requires a plaintiff to show that (1) she engaged in protected opposition to discrimination; (2) she was

subjected to adverse employment action by the employer; and (3) a causal connection exists between the protected activity and the adverse action. *See McCue v. Kansas, Dep't. of Human Resources,* 165 F.3d 784, 789 (10th Cir.1999). "If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action." *Purrington v. University of Utah,* 996 F.2d 1025, 1033 (10th Cir.1993). If the employer offers such a reason, the plaintiff may survive summary judgment by showing that there is a genuine dispute of material fact as to whether the proffered reason for the challenged action is pretextual. *See Richmond v. Oneok, INc.,* 120 F.3d 205, 208 (10th Cir. 1997).

B.     Retaliatory Hostile Environment

Plaintiff contends that she was subjected to a hostile work environment in retaliation for engaging in protected activity, that is the filing her EEO charge in January 30, 2012.  The Tenth Circuit recognizes that a hostile work environment can constitute an adverse employment action. *See Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1264 (10th Cir. 1998) (co-worker hostility or retaliatory harassment may be an "adverse employment action" if it is sufficiently severe); *see also Noviello v. City of Boston*, 398 F.3d 76, 89 (1st Cir.2005) (workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases).[8]

Defendant appears to conflate the standards used for hostile environment claims and retaliatory hostile environment claims, stating that a plaintiff alleging a retaliatory hostile

---

[8] There appears to be a circuit split on the question of whether a hostile work environment can constitute a retaliatory adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases. Some circuits require the alleged retaliation to be based on an ultimate employment decision "such as hiring, granting leave, discharging, promoting and compensating." *See Noviello v. City of Boston*, 398 F.3d at 89 (citing other circuits).  The Tenth Circuit took up the question in *Gunnell*, which involved co-worker harassment rather than conduct by a supervisor.  However, nothing in the Tenth Circuit's analysis in *Gunnell* limits retaliatory harassment claims solely to conduct by co-workers.

environment claim must demonstrate that she was subject to offensive conduct "*sufficiently severe and pervasive* to establish an *adverse employment action* . . . . Doc. 118 at 11-12 (emphasis added). However, the Court relies on the analysis used in *Jones v. Barnhart*, 349 F.3d 1260 (10th Cir. 2003). The plaintiff in that case had reiterated her allegations of hostile work environment into a retaliation claim, just as Plaintiff does here. The court in *Jones* considered the same underlying conduct under two separate standards: first, based on hostile work environment and based on retaliation. The court ultimately concluded that the alleged incidents "would not lead a rational jury to find them severe or pervasive enough to constitute a racially hostile environment" and then separately concluded that the incidents did not rise to the level of an adverse employment action for the purposes of a retaliation claim. In other words, the analysis in the retaliation claim did not consider whether or not the alleged conduct rose to the level of a hostile work environment, but only whether it constituted an adverse action. In addressing Plaintiff's retaliatory hostile environment claim, then the Court follows the lead in *Jones* and considers the claim in the context of a retaliation claim.

## III.   Prima Facie Case

Both parties accept that Plaintiff engaged in protected opposition to discrimination when she filed the EEO charges, which satisfies the first element of a prima facie case. However, the Court notes that neither party distinguishes between the two EEO charges in the briefs. Plaintiff does not identify either in the complaint or in the response to summary judgment which EEO charge is the "protected activity" and Defendant does not make any effort to distinguish Plaintiff's claims of hostile work environment according to the timeline of the two charges that were filed. The record indicates that Plaintiff filed the first EEO complaint on January 30, 2012, and rescinded it on February 13, 2012. Ex. 5 at 3. The investigation related to this charge was

administratively closed on April 24, 2012.  *Id.* On March 6, 2013, Plaintiff filed the second EEO

charge, which included Claims 1 to 6.   Plaintiff amended that charge twice: on April 22, 2013 to

add Claims 7 and 8 (amendment confirmed by EEO on April 25, 2013), and on August 10th to

add Claims 9 to 11 (amendment confirmed on August 19, 2013. Ex. 3 at 6.  The EEO issued its

final agency decision on April 24, 2014, finding that there was no evidence of discrimination or

retaliation.  Ex. 5.

      A.     Adverse Employment Action

    The next inquiry is whether Plaintiff was subjected to an adverse employment action.

The parties disagree on the definition of "adverse employment action" and in particular, whether

the definition includes a "materiality" requirement.  *See* Doc. 113 at 17 & 118 at 12.  Defendant

relies on the standard set forth by the United States Supreme Court in *Burlington N. & Santa Fe*

*Ry. Co. v. White ("Burlington Northern")*, which states that "adverse employment action" for

purposes of a Title VII retaliation claim contains a "materiality requirement and objective

standard."  548 U.S. 53 (2006)).  Plaintiff points out that the Tenth Circuit has never espoused a

"materiality" requirement" but rather takes a "case-by-case approach. *See Jeffries v. Dep't of*

*Soc'l & Rehab. Serv.*, 147 F.3d 1220, 1232-33 (10th Cir. 1998); *Gunnell*, 152 F.3d 1253, 1264

(10th Cir.1998).

    Seeking to resolve a circuit split on what constitutes an "adverse employment action," the

Supreme Court in *Burlington Northern* broadened the definition to allow retaliation claims based

on an employer's actions not directly related to employment, but still requiring that the adverse

action rise to a requisite "level of seriousness."  548 U.S. at 59; *see, e.g., Williams et al v. W.D.*

*Sports, N.M., Inc. et al.,* 497 F.3d 1079 (finding adverse employment action met as part of prima

facie case based on former employer's opposition to plaintiff's claim for unemployment

benefits).  Under this standard, a plaintiff alleging retaliation under Title VII need only show

"that a reasonable employee would have found the challenged action materially adverse," which

in a retaliation context means it well might have "dissuaded a reasonable worker from making or

supporting a charge of discrimination."  *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452

F.3d 1193 (10th Cir. 2006) (citing *Burlington Northern,* 548 U.S. at 53)).  In *Burlington*

*Northern,* the Supreme Court relied on the concept of "materiality" to "separate *significant* from

trivial harms."  548 U.S. at 69 (focusing on the materiality of challenged retaliatory act "will

screen out trivial conduct while effectively capturing those acts that are likely to dissuade

employees from complaining. . . .") (emphasis added).  Thus, while *Burlington Northern* has

broadened the context for adverse actions in a retaliation claim, it has also made clear that such

actions must be "materially adverse" and "should be judged from the perspective of a reasonable

person in the plaintiff's position, considering 'all the circumstances.'"  548 U.S. at 2417

(reassignment of job duties not automatically actionable"); *see also Semsroth,* 555 F.3d at 1186

(finding denial of transfer not materially adverse at prima facie step of case where there was no

evidence that position was objectively preferable, and where employee presented no evidence

beyond her subjective desire for the position).

Tenth Circuit cases decided after *Burlington Northern* have recognized the materiality

and objective prongs required for adverse employment actions in a Title VII retaliation claim.

*See, e.g., Daniels v. UPS, Inc.,* 701 F.3d 620, 638 (10th Cir. 2012) (while employer's conduct

need not affect the terms and conditions of employment, the inquiry is an objective one, and not

based on a "plaintiff's personal feelings"); *Semsroth v. City of Wichita,* 555 F.3d 1182, 1184

(10th Cir.2009); *McGowan v. City of Eufala et al.,* 472 F.3d 737 (10th Cir. 2006) ("The

materiality of a claimed adverse action is to be determined objectively. . .");  *see also Piercy v.*

*Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (noting that *Burlington Northern* modified

retaliation standards for adverse actions, but "had no similar effect" on discrimination claims).

<u>Claims 1, 7 & 9</u>:  The Court finds that Claims 1, 7 and 9 could arguably constitute

adverse employment actions.  Being turned down for a job position (Claim 1), a non-

recommendation for an interview (Claim 7), and receiving a Letter of Warning ("LOW") (Claim

9) are significant enough events which could dissuade a reasonable worker from making a charge

of discrimination if the worker knew she would not be recommended for a job, or would receive

a LOW.  The other claims (Claims 2-6 and 8) do not constitute adverse employment actions

because a reasonable fact finder would not consider them significant enough to dissuade a

reasonable person from complaining about discrimination, as the Court explains next.

<u>Claim 2</u>:  Plaintiff alleges that she was belittled, disrespected and mimicked. The Court

includes in this claim Plaintiff's allegations that Trujillo belittled other females in the postal

service and that they yelled and screamed at her.  Plaintiff bolsters these allegations with the

testimony of Robert Roark ("Roark"), the acting MPOO in the Tucumcari, New Mexico branch

at the time of the underlying incidents.  Roark's testimony supports Plaintiff's claim that Trujillo

yelled and screamed at women employees.  Ex. U at 56.  Roark also stated that Trujillo had

favorites in the workplace.  Ex. U at 62:23-25 to 63:1 ("[Trujillo] definitely had people he liked

and didn't like.  If he didn't like you he treated you like crap.").  This atmosphere is no doubt

unpleasant and irritating, but is not an adverse employment action.  Title VII "does not set forth

'a civility code for the American workplace.'"  *Burlington Northern,* 548 U.S. at 68.  It does not

address, nor was it meant to address, complaints attacking "the ordinary tribulations of the

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional

teasing."  *Id.; see also McGowan,* 472 F.3d at 742 ("petty slights, minor annoyances, and simple

lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination).

Claim 3:  The three fact-finding interviews are not adverse employment actions. While Plaintiff may have found them to be harassing, the inquiry must be made from the viewpoint of a reasonable person.  Considering all the circumstances, and the fact that no disciplinary measures were taken as a result of these interviews, they cannot in themselves be considered adverse employment actions.  *See McGowan,* 472 F.3d at 742 (in determining whether a claimed action is adverse, "[c]ontext matters").

Claims 4 & 6: revolve around actions taken by Defendant to submit proper medical documentation.  The ELM sets forth requirements for supervisors to collect medical documentation and submission of proper forms for absences, and Plaintiff was not exempt from these requirements.  Actions taken by Flores and Trujillo in requiring Plaintiff to comply with these rules cannot be viewed as an adverse action.  *See Cole v. Powell,* 605 F.Supp.2d 20, 26 (D.D.C. 2009) (requirement of documentation for unscheduled absence are "known to workers everywhere" does not constitute material adverse action).

Claim 5:  does not, as a matter of law, constitute an adverse employment action.  Plaintiff did not even need leave to attend the meeting, and ultimately *did* attend.

Claim 8:  The IMIP held in March 2013 by HR is not an adverse action.  Plaintiff herself requested the meeting to investigate alleged harassment.  Regardless of whether the meeting was long in coming, or Plaintiff did not like the way it was conducted, the meeting itself does not qualify as an adverse action.

Claim 10:  Plaintiff claims her Postal "Access" was removed when Trujillo had her return her communication devices while she was on medical leave.  This action cannot be considered an

adverse action.  It is undisputed that Plaintiff was on non-work status when she was asked to turn in these devices and a reasonable worker would not expect to use her work devices when on a non-work status.

Claim 11: Plaintiff claims she was given "unreasonable expectations" as Postmaster in this claim.  The Court assumes that this claim is also based on other alleged comments made by DiPeri and Trujillo, based on DiPeri's email to Plaintiff and to Erik Setter describing Plaintiff's work unit as an "unacceptable shop" and on comments Trujillo made to DiPeri that he had "concerns" about Plaintiff.   None of these actions or comments rises to the level of an adverse employment action.  A reasonable employee would not be deterred from making a discrimination claim solely because she her employer had unreasonably high expectations of her as a worker and that she would be chastised for not meeting those expectations.   An employer's high expectations—even unreasonably high expectations—are not adverse employment actions.  An employer can set unreasonable standards and fire employees who do not meet them.  *Sampson v. Fed. Express Corp.*, 1996 WL 568792, at *3 (N.D.Ill. Oct. 2, 1996); *see also Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir.2000) ("[T]his court's inquiry into the issue of legitimate expectations is more aptly characterized as simply bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands "too much" of his workers.") (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997)).

Accordingly, except for Claims 1, 7 and 9, Plaintiff's other claims cannot meet the *Burlington Northern* definition of adverse employment action.  They qualify either as routine administrative actions, or actions which are too insignificant to qualify as materially adverse actions, and none of these would have dissuaded a reasonable worker from making a charge of discrimination.  *See, e.g., McGowan,* 472 F.3d at 743 (prima facie case failed the test of

22

materiality where plaintiff was not reassigned to a day shift, where there was no specific rational for the transfer other than a subjective preference, and because a reasonable person would not be deterred from making a discrimination claim if she knew she would be denied a shift change).

    B.    <u>Causation</u>

To establish a causal connection between that activity and the adverse employment action, and thus a prima facie case, the adverse action must closely follow the protected activity. *See Candelaria v. EG&G Energy Measurement, Inc*., 33 F.3d 1259, 1261 (10th Cir. 1994); *Burrus v. United Tele. Co., Inc*., 683 F.2d 339, 343 (10th Cir.1982) (causal connection may be established by showing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action"); *Anderson v. Coors Brewing  Co.,* 181 F.3d 1171, 1179 n.2 (10th Cir. 1999) (adverse action must occur after protected activity, not before). For those claims on which Plaintiff has demonstrated an adverse employment action (Claims 1, 7 and 9) Plaintiff cannot establish this proximity based on the first EEO charge.

The earliest conduct underlying her EEO claims occurred on October 31, 2012, which was *nine* months from the filing of her first EEO charge on January 30, 2012, and *six* months from when the investigation was closed, on April 24, 2012.  In fact, *all* of the alleged claims and underlying conduct (including those which the Court has found were not adverse actions) that occurred prior to March 2013 is too far in time to suggest a temporal proximity—and therefore a causal connection—between the protected activity (the filing of the first EEO charge) and any of Defendant's alleged unlawful conduct.  *See Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993) (two-day time lapse can support an inference of causal connection); *Meiners v. Univ. of Kan*., 359 F.3d 1222, 1231 (10th Cir. 2004) ( six-week period between protected activity and

adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient); *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1204 (10th Cir.2008) (three-month span was too long to infer retaliatory motive); *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir.1997) (a period of three or four months or more between the protected activity and the adverse action generally is insufficient to support an inference of causation).

Thus, even though Plaintiff has alleged several claims which could constitute adverse employment actions, she has failed to establish a prima facie case on those claims because she cannot show a causal connection between the filing of her January 2012 EEO charge and the alleged adverse conduct.

However, Plaintiff has also alleged conduct which occurred after the filing of her second EEO charge on March 6, 2013:

- March 28, 2013: Plaintiff received an email addressed to her and Erik Setter from DiPeri, calling her work unit "disappointing and disgraceful";

- May 26, 2013: fact-finding interview regarding failure to provide additional medical documentation for sick leave;

- May 29, 2013, Trujillo mandated that Plaintiff  "arbitrarily" impose fact-finding interviews on her staff;

- June 6, 2013: Trujillo issued Plaintiff a Letter of Warning ("LOW") evaluation for failure to follow instructions regarding the timely completion of a project called the "Scheduling and Staffing Tool" ("SST") (Claim 7);

- June 2013: Plaintiff was required to work when on sick leave;

- July 1, 2013: Trujillo emailed DiPeri regarding alleged problems with Ms. Montano, stating that he had "concerns and frustrations" about Plaintiff.[9]

---

[9]   Because Plaintiff has presented over fifty (50) Additional Facts, it is unclear where each of these facts fit into the eleven EEO claims.  The Court groups them where it would be most appropriate, under Claims 2 and 11, but the grouping has no bearing on the analysis.

Based on the Court's foregoing discussion, only the issuance of the LOW constitutes an adverse employment action because it was issued in early June, which falls within a time frame sufficient to suggest a causal connection between the protected activity (the filing of the March 2013 EEO charge) and this adverse employment action.

## IV.   Defendant's Legitimate Reasons

Once a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action." *Purrington v. University of Utah,* 996 F.2d 1025, 1033 (10th Cir.1993).  The only claim on which Plaintiff has met both the adverse action and causation elements of a prima facie case is the issuance of a LOW on June 6, 2013 (Claim 9).  The letter (Ex. 12) charged Plaintiff with a failure to follow instructions based on her failure to timely complete a work project, and for compounding this failure with unfounded excuses, such as not having the password for access.  Such conduct would be a legitimate reason for issuing a letter of warning to an employee.  The issuance of the LOW was not disproportionate to the gravity of Plaintiff's conduct, and it did not have any effect on her Plaintiff's work conditions, assignment or promotions.

Defendant has presented a legitimate, non-retaliatory reason for the issuance of the LOW in Claim 9.  Because the LOW is the only claim to pass the adverse action and causation elements of a prima facie case, there is no need to examine whether Defendant has presented other legitimate reasons for taking other actions which underlie the other ten claims.  However, even assuming that these other claims met all of the elements of a prima facie case, Defendant would still have met its burden of production at this stage, since they present legitimate reasons for all the other actions taken:

- In Claims 1 and 7, Plaintiff did not get an interview for the Texas position and was not recommended for the Albuquerque Postmaster position.  However, it is undisputed that

Plaintiff did not score as high as the other applicants who were selected for an interview; and there is no evidence the selection was related in any way to the filing of Plaintiff's EEO charge. Regarding the Texas position, there is no evidence either that Flores ever communicated with Ms. Gosdin about the hiring decision for that job, or that Ms. Gosdin was aware of Plaintiff's prior EEO activity. *See Williams v. Rice,* 983 F.2d 177, 181 (10th Cir. 1993) (employee cannot establish causation as part of prima facie case where employer is unaware of the protected activity). There is also evidence to rebut Plaintiff's contention that she did not get the Albuquerque Postmaster position (Claim 7). Again, Plaintiff simply did not score as high as other applicants. These reasons offered by Defendant support a finding that the selections for these positions were made based on the legitimate reason that Defendant selected the most qualified applicant;

- Plaintiff alleges that Flores and Trujillo "belittled" her and "minimized" her authority (Claim 2), but Defendant's evidence indicates that her supervisors were unhappy with the efficiency at the Santa Fe branch where Plaintiff was Postmaster. The emails sent to Plaintiff calling her "disappointing and disgraceful" were also directed to her immediate supervisor, Erik Setter. Correspondence between Trujillo and DiPeri shows a concern and frustration with both Plaintiff and Setter in running the Santa Fe branch and in the branch's failure to serve its customers. Such frustration would be a legitimate reason to threaten to fire Plaintiff, as Plaintiff alleges Trujillo did "repeatedly." In yet another allegation, Plaintiff contends that Flores "ridiculed" her for not having correct supervision in the Santa Fe post office over a holiday. When Plaintiff responded that Flores had offended employees and that she was concerned he would retaliate, Flores sarcastically stated that Plaintiff was "amazing." Ex. AA (email dated Jan. 14, 2012). While Plaintiff views these actions as "harassing" and "belittling," the Court finds this is evidence of dissatisfaction with Plaintiff's work performance, and therefore evidence of legitimate reasons for Defendant's conduct. Plaintiff alleges other conduct which the Court finds inconsequential here, such as the mimicking of Plaintiff's voice and the name-calling ("Yas pill" or "Yazzie"). Of course, this kind of conduct cannot be characterized as "legitimate" workplace conduct, but at the same time there is absolutely no evidence that a retaliatory motive was behind this behavior;

- Defendant also gives legitimate reasons for Claims 3 and 4. Two of the three fact-finding interviews were held because of Plaintiff's failure to comply with postal service regulations regarding sick leave documentation. It is undisputed that Plaintiff *was* required to submit such documentation, and it is also undisputed that Plaintiff had not complied with this requirement for her sick leave periods;

- In Claim 5, where Plaintiff contends that her manager refused to approve her leave request to attend the League Postal Forum, Defendant offers the reason that Plaintiff did not *need* her manager's approval since Plaintiff could approve her own leave to attend – which she did;

- The IMIP interview referenced in Claim 8 was requested by Plaintiff, which constitutes Defendant's legitimate reason as to why the interview was held;

- Defendant explains that Plaintiff's postal access (her Blackberry and laptop) was removed, as asserted in Claim 10, when she was on sick leave and would have no use for them;

- In Claim 11, Plaintiff contends that she was given unreasonable expectations as Postmaster. Defendant's evidence shows that these expectations centered around bringing the Santa Fe branch up to speed with the other stations, and improving service to Santa Fe customers. Also, while Plaintiff contends that Trujillo mandated that Plaintiff "arbitrarily" impose fact-finding interviews on her staff, Trujillo's legitimate reason for insisting on these interviews was to address excessive use of overtime at the Santa Fe postal stations.

Defendant has therefore presented legitimate reasons for all of the conduct which Plaintiff alleges as retaliatory in all of her eleven claims.

## IV. Pretext

Under Title VII, a plaintiff bears the ultimate burden of proving intentional discrimination, or in this case, retaliation. *See Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir.2015); *Adamson v. Multi Cmty. Diversified Servs., Inc*., 514 F.3d 1136, 1145 (10th Cir.2008). At this stage of the analysis, Plaintiff must show that Defendant's proffered reasons for its actions were pretextual and done with a retaliatory motive. Plaintiff can do this by demonstrating that these reasons were "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief. *Young v. Dillon Cos.,* 468 F.3d 1243, 1250 (10th Cir. 2006).

Plaintiff has presented no evidence on any of the claims to suggest an inference of retaliatory motive. There is no evidence that Defendant's issuance of the LOW (which is the only claim that has satisfied prima facie requirements) was issued because Plaintiff filed her second EEO charge. Without such evidence, this claim must fail. *See Candelaria v. EG&G Energy Measurement, Inc.,* 33 F.3d 1259, 1261 (10th Cir. 1994) (close temporal proximity

serves to show causation for prima facie case, but plaintiff is still required to show evidence of pretext).

Nor has Plaintiff shown evidence of pretext for any of the other claims, even assuming these other claims could make it past a prima facie case. Defendant's legitimate reasons are supported by evidence that remains undisputed and unrefuted by Plaintiff: For Claims 1 and 7, for example, Plaintiff may have believed she was the best qualified for the Texas position or for the Albuquerque Postmaster position, but her disagreement with Defendant's choice of applicants has no bearing on her retaliation claim. *See Rivera v. City & Cty of Denver,* 365 F.3d 912, 924-25 (10th Cir. 2004) (relevant inquiry is not whether employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs).

For Claim 2 (regarding "belittling" conduct), Plaintiff submits the testimony of Robert Roark, which does support Plaintiff's contention that Trujillo yelled at women. However, this evidence proves only that Trujillo played favorites, and that he was nice to people he liked but verbally abusive to others he did not like. This behavior may be childish and unpleasant to bear in a work environment, but it is not evidence of a retaliatory motive toward Plaintiff. Comments made by Trujillo to Plaintiff which she found "belittling" and "minimizing" to her work authority demonstrate Trujillo's expressions of dissatisfaction with *both* Plaintiff and her immediate supervisor in the way they were running the Santa Fe postal branch. *See* Ex. T at 97:22-25 (telling both Plaintiff and Setter that the Santa Fe was the "eyesore of the district" and that the both of them "should be embarrassed" and wondered about the "corrective action for overruns. . . ."). No reasonable factfinder would conclude that these statements were made because Plaintiff had filed an EEO charge.

Similarly, no reasonable factfinder would conclude that Flores mimicked Plaintiff's voice and called her "Yas" or "Yazzie" to others because she filed an EEO charge. *See, e.g., Parkins v Civil Constructors of Ill, Inc*., 163 F.3d 1027, 1034 (7th Cir. 1998) (alleged ostracism by employee's fellow workers was not "adverse employment action" within meaning of Title VII, absent evidence that employer ordered any of its employees not to talk to employee or that the alleged shunning resulted in material harm to employee). *Rakovich v. Wade*, 850 F.2d 1180, 1192-93 (7th Cir. 1987) (generic dislike is not retaliation); *Mitchell v. ESPY*, 845 F.Supp. 1474, 1493 (D.Kan. 1994) (dislike is not a pretext for discrimination).

Plaintiff presents no evidence to rebut the actions taken by Defendant in response to her unsatisfactory work performance or her failure to comply with regulations that applied to her when she took medical leave over three days (Claims 3, 4, 6, 10 and 11). Plaintiff attempts to show pretext by relying on the affidavit of David Pratt ("Pratt"), who is the President of the National Association of Letter Carriers, Branch 504. Ex. R. In his affidavit, Pratt asserts that Trujillo, who was acting Postmaster of Albuquerque at the time, directed Pratt's supervisor to routinely deny his right to work on Union activities during work hours. Pratt contends that Trujillo's actions were done in retaliation for Pratt's Union activities. Ex. R, ¶¶9-10. However, Plaintiff cannot use evidence of retaliation alleged by another employee to bolster her own claim of retaliation; such evidence is immaterial to the question of whether Defendant's conduct *toward Plaintiff* was based on Plaintiff's filing of her EEO charge.

Without showing that Defendant's proffered reasons are pretextual, Plaintiff's retaliation claims against both Flores and Trujillo in Counts II and IV of the Complaint fail, and Defendant is entitled to summary judgment on these two Counts.

**CONCLUSION**

In sum, the Court finds and concludes that Plaintiff has presented a prima facie case on several of her claims presented in the EEO charge.  However, Defendant has articulated solid and consistent non-retaliatory reasons for all of the alleged actions taken and Plaintiff has not submitted any evidence from which a reasonable factfinder could conclude that these reasons are not legitimate but are pretextual for retaliatory motive.  Thus, Defendant is entitled to summary judgment on Plaintiff's retaliatory hostile environment claims alleged in Counts II and IV of the Complaint.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Counts II and IV (**Doc. 68**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE