## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

YASMIN MONTANO,

      Plaintiff,

v.                                                    No. CV 14-0634 WJ/GJF

PATRICK R. DONAHOE,
Postmaster General,

      Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT ON COUNTS I AND III and DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER COUNTS V AND VI

THIS MATTER comes before the Court upon Defendant's Second Motion for Summary Judgment on Plaintiff's Counts I and III, filed January 15, 2017 (**Doc. 130**).  Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is well-taken and is therefore granted; further, the Court declines to exercise supplemental jurisdiction over Counts V and IV.

## BACKGROUND

This is an employment discrimination case in which Plaintiff alleges discrimination and retaliation by her supervisors, Michael Flores ("Flores") and Humberto Trujillo ("Trujillo"). The Complaint alleges hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. as follows:

| | | |
|---|---|---|
| Count I: | Title VII sexual harassment against Michael Flores; |
| Count II: | Title VII retaliation against Michael Flores; |
| Count III: | Title VII sexual harassment against Humberto Trujillo; |
| Count IV: | Title VII retaliation against Humberto Trujillo; |

Count V:      Violation of USPS Labor Manual Rule §666.22 (Discrimination and
                 Retaliation); and
Count VI:     Violation of USPS employee labor manual §666.22 (Whistleblower
                 Protection Retaliation).

The Court has become quite familiar with the facts in this case. Defendant's first motion

seeking summary judgment on Counts I and III was denied, even though the facts stacked up in

Defendant's favor.  However, the Court could not grant Defendant's motion because of defense

counsel's failure to follow the requirements of Rule 56 of the Federal Rules of Civil Procedure

which requires a defendant to present to the Court the undisputed *material* facts in a case on

which summary judgment is sought.  In the Memorandum Opinion and Order denying summary

judgment, the Court noted that Defendant had "painted itself into a corner" by "avoiding the

substantive facts of a prima facie claim in its presentation of 'undisputed' facts" and in doing so,

"effectively precluded the Court from granting it summary judgment."  Doc. 120 at 4.  Defense

counsel eventually presented the salient undisputed facts in its reply instead of in the motion

where they properly belonged, but it was too late:

> Had Defendant presented this evidence in its motion instead of the reply,
> Defendant would have a good case for summary judgment on Plaintiff's hostile
> environment claim. However, the best the Court can do here is note the
> substantive evidence presented by Defendant rebutting Plaintiff's claim of hostile
> environment, but ultimately the Court must deny summary judgment because
> Defendant, as the moving party, failed in its motion for summary judgment to
> make a prima facie demonstration of the absence of a genuine issue of material
> fact and entitlement to summary judgment as a matter of law.

Doc. 120 at 25.  Defendant fared much better on summary judgment regarding Counts II and IV

alleging retaliation under Title VII.  The Court found that Plaintiff failed to submit any evidence

from which a reasonable fact finder could conclude that the reasons for Defendant's actions were

pretextual for retaliatory motive.  Doc. 121.

## I.    Allegations in Complaint

The Complaint alleges that Plaintiff began working for the United States Postal Service ("USPS") in June 1985.  From 2001-2010, Plaintiff served as one of the three Managers of Postal Operations ("MPOO") within the New Mexico District, overseeing Postmasters around New Mexico.  In 2010, the New Mexico District was consolidated into the Arizona District and Ms. Montano's position was eliminated.  She was not selected for an MPOO position in the newly consolidated District.  In July 2011, Plaintiff was hired as the Postmaster of Santa Fe, New Mexico and retained her level 25 pay for a period of two years while serving in the level 24 Santa Fe Postmaster position.  Following the 2010 consolidation, Plaintiff reported to MPOO Mike Flores.

In this lawsuit, Plaintiff asserts that Flores discriminated against her by harassing her on the basis of her gender (Count I).  On January 30, 2012, Plaintiff initiated an EEO charge against Michael Flores alleging race, color, sex discrimination and harassment stemming from Flores' verbal threats and repeated and unfounded investigative "interviews."  The Complaint states that Plaintiff rescinded that charge when District Manager John DiPeri advised Plaintiff that he had negotiated and discussed the issues with Flores, and that Flores would cooperate with Plaintiff by working on the relationship to achieve better communication.  Plaintiff also alleges that Trujillo also harassed and discriminated against her on the basis of her gender (Count III).

Following additional discovery pursuant to Fed.R.Civ.P.56(d) (see Doc. 101), Defendant now makes a second attempt at securing dismissal of Counts I and III through summary judgment.  Defendant contends that the alleged conduct was not sufficiently severe or pervasive to support Plaintiff's claims for sexual harassment or hostile work environment.

## II.      Undisputed Facts[1]

Despite giving defense counsel a clear signal regarding the deficiencies in the initial summary judgment motion, the Court sees similar problems on this second round.  In its Statement of Undisputed Facts, Defendant cites almost entirely to facts taken from Plaintiff's Statement of Additional Facts in her response to Defendant's initial summary judgment motion (Doc. 112). A defendant seeking summary judgment is required to offer facts which are undisputed and which entitle the *defendant* to summary judgment.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (". . . the moving party bears the burden of demonstrating the absence of a genuine issue of material fact"). The Court cannot imagine how citing to *Plaintiff's* facts bolsters Defendant's position, and can only conclude that defense counsel still does not grasp either the purpose or procedure behind Rule 56.  Thus, the facts set forth below are essentially facts alleged by *Plaintiff,* and not *Defendant.* Fortunately, Defendant does eventually present the salient facts within its discussion instead of including them in its "Statement of Undisputed Facts" section where they belong, which leaves it to the Court to round up these facts in order to make a determination of the relevant issues.  In mentioning these shortcomings, the Court hopes that defense counsel is moved to seek out ways to refresh her federal motions practice skills relative to Rule 56.

*Facts Concerning Mike Flores*

---

[1] The Court will generally omit references to supporting exhibits because references are provided in the briefs.  The facts included here are undisputed unless otherwise noted.  Defendant cites mainly to facts taken from Plaintiff's Statement of Additional Facts in her response to Defendant's initial summary judgment motion (Doc. 116), which is puzzling, since a defendant seeking summary judgment is supposed to offer facts which are undisputed and which entitle the *defendant* to summary judgment.  *See Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993) (". . . the moving party bears the burden of demonstrating the absence of a genuine issue of material fact").  The Court cannot imagine how citing to *Plaintiff's* facts bolsters Defendant's position, and can only conclude that defense counsel still does not grasp either the purpose or procedure behind Rule 56.  Because Defendant has presented the salient undisputed facts throughout its discussion instead of in its "Statement of Undisputed Facts" section, the Court is forced to find these facts in order to make a determination of the relevant issues.

Following consolidation by the United States Postal Service of the New Mexico District into the Arizona District in 2011, Plaintiff reported to MPOO Flores.  Between October 2012 and May 2013, Flores imposed three (3) investigative interviews, also known as "fact-finding" interviews, on Plaintiff within a five-week period.  A fact-finding interview includes a written notice of alleged deficiencies, the opportunity to have a representative present, and the potential for discipline.  Plaintiff considered the imposition of these interviews as "harassing."

On November 2, 2012, Flores requested a meeting with Plaintiff.  During the meeting, Flores stated that he "was caught off guard with your [Plaintiff's] behavior today. . ." and that he was "deeply concerned over what seems to be reluctance on your part to accept my support for your success." Plaintiff responded that Flores's actions were demeaning and adverse, that he had singled her out, and that he had "no respect for me or anything that I contribute to Santa Fe."  On November 5, 2012, Flores conducted a "business review" of Ms. Montano in the presence of a lower level manager, which Plaintiff believed to be an unusual practice.  Plaintiff claims that Flores told her that because she had brought an EEOC charge against him, he wanted to make sure he "wrote down what we say" or "what [his] expectations are."  Pltff's Add'l Fact 2.

On Sunday, December 16, 2012, Flores called Plaintiff at her home, yelling, told her that if she had any early starts the next day, she would be fired.  That same month, Plaintiff applied for a position in Coppell, Texas.  Mr. Flores was aware of her application but he had no communications with anyone regarding Plaintiff's application, nor was he asked for a recommendation.  Ex. 3 at 91:11-25.  Plaintiff was not interviewed or selected for the position.

On January 28, 2013, Flores accused Plaintiff or not managing her station.  That same month, he also failed to respond to Plaintiff for several weeks regarding her request for leave to attend a work-related Legislative Forum.

5

On February 8, 2013, Flores sent Plaintiff home to obtain medical release documentation and told her she had to be "on sick leave or some other type of leave until" she obtained such documentation.  He ordered Plaintiff to "go home and not come back" until she obtained another medical release because the Health Unit Nurse Halina Gronowski "needs additional medical." Plaintiff claimed that Flores was laughing at her during this phone call.  When Plaintiff returned to work from sick leave on January 15, 2013 (24 days before February 8, 2013), she already had an FMLA release.  Plaintiff asked Flores if she could continue working and produce the additional medical document on February 15 when she had a doctor's appointment, but he denied her request.

A team of lower level postal officials called the "dream team," arrived to evaluate Plaintiff's post office in Santa Fe (the Coronado Station) on February 9, 2013 when Flores ordered Plaintiff to leave work to obtain additional medical documentation.  The "dream team" consisted of lower level postmasters reporting to Flores who were supposed to conduct route audits.

In August 2012, Plaintiff requested Human Resources ("HR") intervention.  Arizona District Manager John DiPeri told Plaintiff through an HR Manager to "get a book and learn how to deal with [her] manager."

The USPS Policy of Workplace Harassment requires any manager who receives a complaint to "see that a prompt and thorough investigation is conducted."

As part of the Initial Management Inquiry Process ("IMIP"), which is also known as the "Harassment Interview," Plaintiff was interviewed in March 2013.  The HR interviewer, Regina Beckhum, an African-American female, found that "[b]ased upon the initial inquiry, the

allegations raised by Ms. Montano are subjective and appear to be related to organizational issues.  A hostile working environment has not been demonstrated."

Flores called Plaintiff by unwanted nicknames, including "Yas" and "Yazzie" and at least on one occasion told Plaintiff she should "take a Yas pill." Plaintiff also claims that Flores mimicked her voice while not in her presence ". . . chang[ing] his voice to a very highpitched victim-type voice."

Plaintiff is not claiming damages based on any actions of Defendant and Michael Flores based on sex discrimination or sex harassment prior to February 13, 2012.

*Facts Concerning Humberto Trujillo*

While Flores was serving a detail in Long Beach, California, Trujillo temporarily served as the acting MPOO.  He served as Plaintiff's supervisor from March 2013 until July 6, 2013 when Plaintiff took sick leave.

On May 29, 2013, Trujillo sent Plaintiff an e-mail with the mandate that she should have a minimum of 10 Findings of Fact and 5 corrective action packages by the close of business that Friday.  On June 6, 2013, while Plaintiff was on sick leave, Trujillo gave Plaintiff a Letter of Warning ("LOW") evaluation due to a "suspense"[2] that had not been completed the prior month that Plaintiff believed to be completed.

In July, 2013, during Plaintiff's FMLA leave, Trujillo ordered that Plaintiff turn in her USPS Blackberry and laptop.

In an e-mail to Plaintiff and Erik Setter, Plaintiff's manager at the Coronado Station, Trujillo called that station the "worst in the district," stating that she should be "embarrassed" and that she was the "eyesore of the district."  On March 28, 2013, District Manager John DiPeri

---

[2] It is not clear from the pleadings what is meant by a "suspense" or "suspense item."  The task that had not been completed concerned a "Scheduling and Staffing Tool" that required finalization.  Ex. 10.

e-mailed Plaintiff and Mr. Setter, calling her "disappointing and disgraceful" and asked "How long is it going to take for you to follow my instructions? Flores was copied on this e-mail, and Flores responded saying he would "follow up" on the e-mail.

On June 10, 2013, Trujillo ordered Plaintiff to the district office for a fact-finding for failure to follow instructions, and told Plaintiff he would "not tolerate the lack of respect for my instructions." On July 1, 2013, Trujillo e-mailed District Manager DiPeri stating that he had "concerns and frustrations" regarding Plaintiff.

Plaintiff's additional facts add a bit more detail to those set out by Defendant (because after all, Defendant relied on Plaintiff's facts in setting them out), but many of these facts are either immaterial, are self-serving, or constitute legal conclusions. *See Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir. 1995) (nonmovant's conclusory and self-serving statements, without other supporting evidence, are insufficient for the purpose of surviving summary judgment). For example, Plaintiff's Additional Fact 1 states that Flores knew about the EEO charge she brought against him. Defendant has never disputed that Plaintiff brought this charge, nor is it relevant to Plaintiff's hostile environment claims in Counts I and III.[3] In Additional Fact 3, Plaintiff states that Flores was "relentless" in disciplining her, humiliating her, and in trying to "ruin her reputation"; and in Additional Fact 5, Plaintiff states that Trujillo "repeatedly threatened to fire" her. However, aside from these general accusations, there are no specific dates or specific instances which give this statement any context sufficient to consider for summary judgment purposes. Similarly, in Additional Fact 6, Plaintiff states that "[e]very time Flores or Trujillo demanded Plaintiff attend an investigative interview while she was on sick leave, it was another instance of them harassing her." Legal conclusions are not facts, and

---

[3] Flores' awareness of Plaintiff's EEO charge is, however, relevant to Plaintiff's retaliation claims in Counts II and IV. *See* Doc. 121 at 17-18 (granting Defendant summary judgment on those claims).

are also insufficient for a nonmovant to avoid summary judgment.  *See Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (nonmovant must "set forth specific facts from which a rational trier of fact could find for the nonmovant).

Plaintiff offers a few facts which are material to her hostile work environment claims, although they are cumulative to those presented by Defendant.  For example, Plaintiff states that Flores had a lower level manager witness her "business review" in order to take notes.  Add'l Fact 2.  In Additional Facts 7-9, Plaintiff gives examples of allegedly harassing conduct: that Flores told other employees that he wanted Plaintiff out of the Postal Service; and that he was "condescending" to her and "belittled her."  Plaintiff claims that Flores was noted to treat female employees in a belittling and degrading manner and that he commented on the work accomplishments of men but discrediting accomplishments by females.  Plaintiff also describes Flores as "abusive" and "hostile" toward her in meetings.

## III.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party.  *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 243 (1986). The moving

party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Only disputes of material fact "preclude the entry of summary judgment." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1111 (10th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party meets its burden, "the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."  *Herrera*, 506 F.3d at 1309 (citation and internal quotation marks omitted).

## DISCUSSION

Title VII's prohibition against sex discrimination includes a ban on sexual harassment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986).   Discriminatory harassment, however, is actionable only if it is pervasive or extreme, amounting to a change in the terms and conditions of employment and creating a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 778 (1998); *see also, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, (1998); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).  In order for a hostile environment claim to survive summary judgment, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quotation omitted).

To evaluate whether a working environment is sufficiently hostile or abusive, a court must examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating,

or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.  *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 23 (1993).  In addition, the environment must be both subjectively and objectively hostile or abusive. *Id*.; *see also Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998). But severity and pervasiveness are not enough. The "plaintiff must produce evidence that she was the object of harassment  because of her gender."  *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998). (emphasis added). [from original].  In short, a hostile environment claim requires a showing of severe and pervasive harassment that is based on gender.

Plaintiff sums up the relevant conduct which she alleges forms the basis for a hostile work environment, as listed in her EEO charge:

(1) Between November 21, 2012 and January 28, 2013, Plaintiff was subjected to harassment.  She felt belittled, disrespected, yelled at, and her manager made degrading comments about her work unit;

(2) On December 22, 2012 and other date(s), she was given a fact-finding Interview;

(3) On November 21, 2012 and February 8, 2013, she was sent home and told to bring medical documentation;

(4) On January 5 and 11, 2013, her manager refused to approve her leave request to attend the League Postal Forum;

(5) On March 1, 2013, her manager refused to approve her leave request to attend the League Postal Forum;

(6) In March 2013, Plaintiff was given an IMIP, or "Harassment Interview" by HR and was not told the reason for the IMIP;

(7) On June 6, 2013, she received a Letter of Warning; and

(8) On an unspecified date, her Postal access was removed.

Doc. 131 at 7.[4]

_____

[4] Plaintiff characterizes this list as inclusive, but not exhaustive, of the allegedly harassing conduct.  The Court's discussion will encompass the entirety of Plaintiff's charged conduct. However, the Court will not consider non-

## I.      Severe and Pervasive Requirement

Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is "sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment." *Lockard v. Pizza Hut, Inc.* 162 F.3d 1062, 1071 (10th Cir. 1998) quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. at 67.

There is no "mathematically precise test" for determining whether the conduct is sufficiently severe or pervasive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. at 22.  Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Smith v. NW Fin. Acceptance Corp.*, 129 F.3d 1408, 1413 (10th Cir. 1997); *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.2005)). ). Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening. *See, e.g.*, *Lockard,* 162 F.3d at 1072 (allowing claim based on single incident).[5] The concept of "pervasive" is not a counting measure.  Rather, the trier of fact utilizes a broader contextual analysis.  *Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, *1414 (10th Cir. 1997).

Plaintiff can survive summary judgment if she can show that evidence of the alleged conduct can be considered either severe *or* pervasive, *and* that the complained of conduct was carried out because of her gender.   Plaintiff may have been offended by the alleged gender-

---

specific conduct or conclusory allegations as a basis for her hostile work environment claim, such as Plaintiff's claim that "[o]n an unspecified date, she was given unreasonable expectations as a Postmaster."  Doc. 131 at 7.

[5]  The plaintiff in *Lockard* was a Pizza Hut waitress who alleged that her employer created a hostile environment by refusing to address the conduct of two male customers, who commented to plaintiff that she smelled nice, pulled her by the hair, grabbed her breast and placed his mouth on it.  162 F.3d at 1072.  The court found that while this was a one-time incident, the harassing nature of the conduct was severe enough to support the jury's finding that it created an actionable hostile work environment.

related comments, but the question is whether a reasonable juror or fact finder would find the comments and conduct offensive.  *See., e.g., Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (finding evidence of offensive behavior and boorish comments insufficient to sustain hostile environment claim where supervisor habitually referred to plaintiff as "grandma," held to the idea that all intelligent women are unattractive, called each of plaintiff's female colleagues a bitch at least once, comments that female employee dressed "like a whore" and had been hired for her looks); *see also Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.2005) (a few isolated incidents of racial enmity or sporadic racial slurs insufficient to constitute harassing conduct) (quoting *Bolden v. PRC, Inc*., 43 F.3d at 551); *Gerald v. Locksley*, 849 F.Supp.2d 1190 (2011) (plaintiff must demonstrate a "steady barrage" of opprobrious racial comments).

Based on the above list, Plaintiff was required to attend three fact-finding interviews; she was told to furnish her employer with medical documentation; leave requests to attend a postal forum were ignored; and she received a Letter of Warning ("LOW") for failure to complete a work project.  None of these work-related actions, even when considered together, can be considered sufficiently severe or pervasive to alter the conditions Plaintiff's employment and create an abusive working environment.  The LOW did not result in any negative effects on Plaintiff's employment.  While Plaintiff considers fact-finding interviews to be harassing, Plaintiff herself utilized these interviews as a supervisor.  Discipline did not automatically result from these fact finding meetings.  According to Plaintiff herself, they are considered more of an information-gathering tool which provided the means to a "verbal discussion pending that the performance [of the employee] improved."  Ex. 2 (Pltff's Depo.) at 44:1-8.

Plaintiff also balks at Flores having a witness at the November 2012 "business review."

Flores believed it prudent to have a witness to their conversation to prevent misunderstandings:

> Q.      Do you remember that you called in Brenda Panas to take notes?
>
> A.      Yes.
>
> Q.      Okay.  And why was that?

A.      I felt it was appropriate to take notes in a meeting with Yasmin.  Because as I told Yasmin before, I think sometimes we don't listen to each other the same way.  And so having a third party there might improve any—or minimize the chance of misunderstanding.  And it was also a good way to be sure that any action plans that we initiated were documented.

Ex. 3 (Flores' Dep.) at 175:7-17.  Plaintiff contends that Flores' decision to have a witness

present was demeaning and denigrating, and that the November 2012 meeting was evidence of

Flores' intention to threaten her job and ruin her reputation by "parading her into his office for

baseless fact-finding interviews."   Pltff's Add'l Fact 4.  Plaintiff may *subjectively* feel as though

these interviews were hostile and demeaning, but in order to qualify as hostile work

environment, the alleged conduct must also qualify as *objectively* severe or pervasive.  *See Davis*

*v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998).

Plaintiff claims that Flores called her nicknames she disliked and mimicked her voice.

This conduct is certainly inappropriate for work and even childish, but there is no evidence of a

severity or pervasiveness that rises to the level of a hostile work environment, even when

considered with the other alleged incidents.  *Cmp. Huffman v. City of Prairie Vill., Kan*., 980 F.

Supp. 1192, 1201 (D. Kan. 1997) (holding that sexual epithets that a woman worker is a "whore"

or a "bitch" are capable of making the workplace unbearable for the woman verbally so

harassed).  Further, Title VII does not target all behavior (such as name-calling and mimicking)

and boorish conduct that is inappropriate for the workplace and was never meant to be a "code of

workplace conduct." *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (Title VII was not "designed to bring about a magical transformation in the social mores of American workers. . . .") (citing *Gross v. Burggraf Constr. Co.,* 53 F.3d 15331, 1538 (10th Cir. 2005)).

Plaintiff claims she was twice denied leave to attend a postal conferences, one taking place in February 2013 and the other in March 2013.  However, it appears that Flores did eventually respond to Plaintiff's requests for leave and that Plaintiff did attend the conferences, so that what Plaintiff essentially complains of is a *delayed* response to her requests by Flores. Moreover, even if Plaintiff did not attend the conferences because of late permission (or lack of permission) from her superiors, such conduct would still not rise to the level of hostile work environment because a reasonable fact finder would not consider this conduct to create an abusive working environment.  *See* Doc. 115-11.[6]

Plaintiff requested intervention by HR twice.  As a result of her request for a Harassment Interview (or "IMIP") in August 2012, District Manager DiPeri advised Plaintiff (through an HR manager) to "get a book" and learn how to get along with Flores. Plaintiff was also interviewed in March 2013in order to address her allegations against Flores.  She objects to the way that interview was conducted, although it is not clear how the interview process fits into her allegations of hostile work environment.  Plaintiff claims that she was not told the reason for the IMIP and that the interviewer would not her to speak about Flores' mistreatment:

> I got an IMIP, and they wouldn't let me tell them what was going on.  [The interviewer] shut me down, which I never experienced anybody getting an IMIP and being told, You can't say that, you can't say this, you can't say this. You know, when you're testifying under a harassment thing, you're able to let that person know everything you've been through, not being told, Don't talk about it. So I was just sick . . . .

---

[6]  Defendant includes references to Plaintiff's exhibits from the response to the first motion for summary judgment, and the Court also takes judicial notice of other pleadings and exhibits in this case. *See Duhart v. Carlson*, 469 F.2d 471 (10th Cir. 1972). When referring to exhibits from Plaintiff's response to the initial summary judgment motion, the Court will use the docket number of the pleading for reference.

Doc. 112 at 5 (Pltff's Add'l Fact 23).  Since Plaintiff requested the IMIP in the first place, it is

not clear why she did not know the reason for the meeting.  *See* Ex. C (Pltff's Dep.) at 120:9-11

("I believe the interview should have taken place within a week of my requesting intervention,

not six months later").   Part of this claim could be due to confusion on the part of Ms. Beckhum,

who noted in the interview notes that she "[a]t the onset of the Interview, [she] didn't know if the

Complainant was the harassee or the harasser."  Ex. 7 at 4.  Ms. Beckhum was charged with

conducting the interviews of all individuals involved in Plaintiff's harassment claim.  Ex. 7 at 4

("During [Plaintiff's] interview I told [her] that I was there to interview individuals regarding

some complaints of harassment").  At any rate, based on Ms. Beckhum's interview notes, there is

no evidence that Plaintiff was limited in her statements during the interview.  Exs. 7 & 8.

   In her earlier response to the initial summary judgment motion, Plaintiff claimed that the

interviewer, Regina Beckhum, prohibited her from discussing prior harassment.  However, Ms.

Beckhum's copious notes regarding the interview indicate that Plaintiff was given ample time

and leeway in describing her perceived pattern of harassment extending as far back as 2011

through 2012.  *See* Doc. 115-5 (interview notes); Doc. 120 at 8-9 (Mem. Opin. & Order).  There

is simply no evidence to support any kind of hostile work environment in the way the IMIP was

conducted.  Moreover, Plaintiff's claims of hostile work environment are based solely on the

conduct of Flores and Trujillo, and Plaintiff does not allege (nor is there any evidence) that either

of them had a hand either in directing the manner in which these interviews were conducted or in

how Plaintiff's harassment claims were resolved (DiPeri's advice to Plaintiff to "get a book" to

learn how to get along with Flores, or Beckhum's finding that a "hostile working environment

has not been demonstrated").

The actions taken by Flores and Trujillo were not sufficiently severe or pervasive to constitute a hostile work environment.   Defendant offers a case for comparison, *Trujillo v. Univ. of Colo. Health Sci. Ctr.,* 157 F.3d 1211 (10th Cir. 1998).  In that case, the plaintiff alleged that he was the victim of a racially hostile work environment when:

> (1) his supervisor documented improprieties in his job performance;
> (2) his supervisor criticized and checked his work;
> (3) his supervisor sent him memos requesting Leave Requests and Approval forms;
> (4) his supervisor instructed him to cancel a request for leasing space in a building;
> (5) the University refused to refurbish a building he found to operate his program;
> (6) his request to attend a leadership program for Hispanics was denied;
> (7) he was not included as one of the University representatives to the Latin American Educational Fund Anniversary dinner;
> (8) he was not informed that the combination lock to the office housing the Xerox machine had been changed;
> (9) he was required to bring a final budget for one of his programs to a meeting;
> (10) he was excluded from part of the budgetary process; and
> (11) his supervisor placed a corrective action in his personnel file that warned him that he needed to improve his attendance, instructed him that he should not offer employment positions without involving his supervisor, and told not to produce or distribute the Pre-Collegiate Program without first presenting it to his supervisor for review and approval.

In *Trujillo,* the Tenth Circuit affirmed the district court's grant of summary judgment to the defendant and concluded that plaintiff failed to make a showing of pervasive or severe harassment:

> The record on appeal provides evidence of little more than a collection of unrelated incidents where Plaintiff and Dr. Hill were at odds. Plaintiff was not subjected to anything that was physically threatening or humiliating, nor was he subjected to any offensive utterances. . . . Plaintiff's list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims. . . . The hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world.  Normal job stress does not constitute a hostile or abusive environment. As the Seventh Circuit explained, federal law "does not guarantee a utopian work place, or even a pleasant one . . . . [P]ersonality conflicts between employees are not the business of the federal courts." . . . We cannot vilify every supervisor that implements a policy with which an employee disagrees or that monitors her employees' conduct.

157 F.3d at 1214.  The nature of the plaintiff's grievances in *Trujillo* is not unlike the harassment and hostility alleged by Ms. Montano in this case, who also appears to be constantly "at odds" with her supervisors Mike Flores and Humberto Trujillo.  Here also, the alleged conduct did not cause Plaintiff to be subjected to such ridicule, threats or comments that could be considered either severe or pervasive enough to qualify as a hostile work environment.  Plaintiff's perception that her working environment was abusive and hostile, but a reasonable fact finder would not agree and would chalk up the incidents to work place stressors.  While the alleged nickname-calling and mimicking may be unrelated to expected workplace stressors, these few isolated instances are certainly not a basis for Plaintiff's hostile work environment claims.

Plaintiff contends that Flores was abusive and hostile in meetings and that Flores humiliated her by raising his voice in the November 2012 fact-finding interview.  Plaintiff takes issue with the fact a lower-level employee was also present at the meeting to take notes, but her conduct during that meeting could also be described as unprofessional and even insubordinate, according to Flores:

> Q.      . . . What is the first thing that was said at the meeting that you might remember?
>
> A.      I remember asking [Plaintiff] to read an email and tossing it on the table for her to read.
>
> Q.      Okay.  And do you remember raising your voice telling her to read that email?
>
> A.      No.  but she – I may have.  She'd gotten up pretty quick and was walking out.
>
> . . .
>
> Q.      . . . Do you have an independent recollection of [Plaintiff] taking issue with [the witness taking notes]?
>
> A.      Oh, no.  I remember that.

Q.      What do you remember Yasmin said?

A.      She didn't want – she felt uncomfortable with someone taking notes.

. . .

Q.      And you testified that you may have raised your voice.   Why would you have raised your voice?

A.      Because she was walking out of the office and I was trying to get her to stop and finish the discussion.

Q.      Okay.   What else do you remember about the meeting?

A.      I was shocked about her abrupt departure.

Ex. 3 at 175:21-25; 176:1-3, 8-15; 177:20-25; 177:1-2.[7]

Therefore, the Court finds that Plaintiff has not presented factual disputes to suggest that the alleged conduct of Flores and Trujillo constitute hostile work environment.

## II.      Gender Motivation

A hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on gender. The "plaintiff must produce evidence that she was the object of harassment because of her gender." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998); *see Gross v. Burggraf Construction Co.*, 53 F.3d 1531, 1546 (10th Cir. 1996) ("if the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir.1994).

---

[7] In her response to Defendant's first summary judgment motion, Plaintiff also describes this meeting as one in which Flores "threw papers" at her and "forced" her to read an e-mail in front of a secretary.  Doc. 112, Pltff's Add'l Fact 10.

In addition to proving that the alleged conduct was considered either severe or pervasive (which the Court has found it is not), Plaintiff is also required to show that it was gender-motivated. The instances cited by Plaintiff as belittling and degrading events are at most, unpleasant and perhaps frustrating, but not evidence of a hostile work environment due to her gender.

Plaintiff claims that Flores treated female employees in a belittling and degrading manner. To support this contention, Plaintiff cites to the deposition testimony of Robert Roark, the acting MPOO in the Tucumcari, New Mexico post office. Roark did state that Flores and Trujillo belittled other females in the postal service as well as Plaintiff by yelling and screaming. However, when specifically asked, Roark denied that women were treated differently than men. Ex. 1 (Roark Depo.) at 62-63. Instead, he acknowledged that Trujillo and Flores' behavior was based on whether they liked or disliked the individual—whether the individuals was a man or a woman. *Id.* ("[Trujillo] definitely had people he liked and didn't like. If he didn't like you he treated you like crap."). Favoritism exhibited by Trujillo or Flores is not in itself harassment without an impermissible motive. *See Taken et al. v. Okla. Corp. Comm.,* 125 F.3d 1366 (10th Cir. 1997) (favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification). Here, because Trujillo and Flores were equally unkind to both men and women, their behavior cannot be considered part of a hostile work environment proscribed by Title VII.

Plaintiff also considers Flores' mimicking her voice and name-calling (for example, that Plaintiff should take a "Yas Pill") as demeaning and having a sexual connotation. None of this evidence points to animosity towards Plaintiff based on her gender, despite Plaintiff's subjective description of the evidence. *Cmp. Huffman v. City of Prairie Vill., Kan.,* 980 F. Supp. 1192,

1201 (D. Kan. 1997) (holding that sexual epithets that a woman worker is a "whore" or a "bitch" are capable of making the workplace unbearable for the woman verbally so harassed). Further, while this behavior (such as the name-calling and mimicking) is certainly not appropriate for the workplace, it is also not targeted by Title VII, which monitors discriminatory behavior, not incivility. *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (Title VII is not a code of workplace conduct, nor was it "designed to bring about a magical transformation in the social mores of American workers. . . .") (citing *Gross v. Burggraf Constr. Co.,* 53 F.3d 15331, 1538 (10th Cir. 2005)).

All of the other instances of alleged hostile work environment were not even remotely connected to Plaintiff's gender, and all were tied to legitimate business reasons.  The Court addresses these instances next.

A.      Fact-Findings, Business Reviews and General Work Performance

There is no evidence that any of the fact-findings interviews were imposed on Plaintiff because of her gender, and no evidence that more female employees than men were required to attend these interviews.  Flores' decision to have a witness sit in to take notes at the November 2012 business review meeting may have been unusual, but it was done to avoid any misunderstandings between them, which given the history of their relationship was a legitimate (and wise) business decision.  Ex. 3 (Flores' Dep.) at 175:7-17.  Plaintiff presents no facts to indicate otherwise.

Plaintiff makes much of the fact that Flores brought in a "dream team" to evaluate the Coronado Station, claiming that Flores sent her home for additional medical documentation on the same day the "dream team" was scheduled to start the evaluation in order to minimize her involvement with the evaluation and to demean and demoralize her.  There is no evidence that

Flores brought in the "dream team" to minimize or demean Plaintiff, but there *is* evidence that the Coronado Station where Plaintiff was Postmaster was in an unsatisfactory state of affairs as compared to other post offices in the region.  Defendant presents evidence showing that the Coronado Station ranked extremely low in the system and was in need of an overhaul.  Flores expressed dissatisfaction with Plaintiff's performance at the Coronado Station.  In his deposition, Flores stated that was "not happy with the performance in Santa Fe and I'm not happy with the performance in other units, too.  Santa Fe is ranked based on most assessments as the poorest performer in my area." Ex. 3 at 77:20-25.  In fact, the Coronado Station was ranked 31 out of 35 in the district.  Ex. 3 at 236:1-5.

Dissatisfaction with the Coronado post office was expressed not only by Flores, but by DiPeri as well.  On March 28, 2013, DePeri sent an e-mail to Plaintiff and Setter, copying Flores, calling the situation "disappointing and disgraceful."  Plaintiff may have felt belittled by these comments, but the source of these comments arose from a genuine concern for the business operations of that post office, and they were not directed solely at Plaintiff but for her immediate supervisor Erik Setter, as well:

> Erik and Yasmin, **This is a totally unacceptable shop.  Disappointing and disgraceful.**  How long  is it going to take for you to follow my instructions?  Mike, I will not tolerate another failed shop from Santa Fe. . . fix this issue because the postal service cannot afford to not serve the customer again.  Do a complete investigation and take the appropriate corrective action that will correct this failure. . . . .

Doc. 114-24 (Ex. X to Pltff's Resp. to initial Mot. For Sum. J.) (emphasis added).[8]

Thus, the overwhelming evidence shows that the "dream team" was brought in for legitimate business reasons.  Plaintiff's claim that "degrading comments" were made about her

---

[8]  Defendant cites to DiPeri's email only partially.  To put it in proper context, the Court refers to the exhibits submitted with earlier summary judgment pleadings.  *See* Fed.R.Civ.P. 56(c)(3) (court can consider "other materials in the record" for summary judgment purposes).

work may have been unnecessarily harsh to take, but there is no evidence at all that such comments were made because of her gender, which is a necessary component for hostile work environment claims.

Plaintiff characterizes as harassment certain instances where she was directed to address the deficiencies of the Coronado Station.  One instance Plaintiff considers harassing is the mandate sent by Trujillo in an e-mail requiring her to have a minimum of 10 Findings of Fact and 5 corrective actions completed within a certain time period.  However, it is clear from the express language of the e-mail that Trujillo's directive was specifically aimed at addressing excessive use of Penalty Overtime ("POT") by the Santa Fe stations—an issue that had persisted over the course of more than one week:

> Of the 47 hours of POT used yesterday Santa Fe had 23 of those hours. Main 8 hours and Coronado 15.  What actions were taken for yesterdays [sic] performance? . . . Where is the corrective action from last weeks over runs? I should have a  minimum of 10 FF [fact-findings] and 5 corrective action packages by Friday . . . .

Ex. 6.  There is nothing in the e-mail suggesting any intention by Trujillo to make unreasonable demands on Plaintiff because she is female.   Performance improvement is a legitimate business of any employer, including the USPS. Both Flores and Trujillo may have been more diplomatic and delicate in the directives they issued to Plaintiff, but Title VII does not require this.

B.     Requests for Leave and Leave Documentation

As mentioned previously, Plaintiff alleges that Flores failed to respond to Plaintiff for several weeks regarding her requests for leave to attend a work-related postal forum.  However, there is no evidence to suggest that Flores' delayed response (or for that matter Flores' failure to respond at all) was motivated by Plaintiff's gender.

Plaintiff claims that Flores' request for additional medical documentation for her sick leave was unjustified, and that it was an excuse to remove her from the post office while the

"dream team" was on site for its evaluation. Here again, there is no evidence at all that Plaintiff was required to get additional medical documentation because of her gender. Flores' e-mail to Plaintiff requesting the additional documentation was professional in tone and clear about the reason for the request. *See* Ex. 5. Plaintiff contends that she had submitted FMLA paperwork documenting her leave, but Defendant presents evidence stating that postmasters are required to submit a PS Form 3971 within two days of returning to work if absent more than 3 days. Ex. 4. As a Level 24 Postmaster and former Level 25 POOM, Plaintiff was expected to be familiar with medical documentation requirements. Ex. 3 (Flores' Dep.), 247:3-13. Other Postmasters acknowledge that Form 3971 is a requirement, and that as a POOM, Plaintiff herself would require this form to be submitted from her postmasters. *See* Roark Depo, Ex. 1, p. 97, l. 20-p. 98, l. 8. It is undisputed that Plaintiff did not submit a form 3971, and her position that the FMLA paperwork that was submitted *should* have been adequate does not rebut Defendant's evidence that Plaintiff had not complied with the submission of the proper postal service medical forms when she returned from sick leave. *See also* Ex. E at 10 (Beckhum's notes stating that Flores stated that "Yasmin brought in the wrong documentation. It was for FMLA and it didn't have a release from the doctor.").

      C.    <u>Letter of Warning</u>

     On June 6, 2013, Trujillo gave Plaintiff a Letter of Warning ("LOW") due to a suspense that had not been completed the prior month that Plaintiff believed was completed. The LOW was signed by MPOO Flores, citing various violations of the Employee Labor Relations Manual (ELM). Ex. 10. Plaintiff considers the LOW to be "baseless," *see* Doc. 131 at 8, n.1, but the actual LOW details Plaintiff's failure to follow the work instructions given to her. Plaintiff contends that she had delegated the task to her station manager, but the LOW notes that she

failed to "directly oversee or verify that the action was actually completed despite repeated warnings that Santa Fe was not in compliance." Ex. 10.  Plaintiff does not dispute that the task was not completed, nor does she dispute that she had not verified completion of the task from the person to whom the task was delegated. The LOW also goes on to state that Plaintiff's explanations for her failure to complete the task "were misleading and ultimately inaccurate." *Id.* at 1. Plaintiff was cited for her failure to discharge her duties, failure to obey orders, failure to conduct herself honestly and reliably, and failure to cooperate in investigations.  *Id.* at 2.

As noted earlier, there were no negative implications from the issuance of the LOW.  *See Fortner v. State of Kansas*, 934 F.Supp. 1252 (D.Kan.1996), aff'd 122 F.3d 40 (10th Cir.1997) ("there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions . . . of Title VII") (citation omitted).   Here again, the reasons for issuing the LOW was a legitimate business decision, and Plaintiff presents no facts which infer it was gender-motivated.

D.    Collection of Electronic Equipment

In July 2013, during Plaintiff's FMLA leave, Trujillo ordered that Plaintiff turn in her USPS Blackberry and laptop.  Plaintiff asserts that this inhibited her ability to perform her job. The evidence indicates that while Plaintiff was unable to work from home, Trujillo felt this would hinder her recovery.  Ex. 12.   Trujillo was aware that Plaintiff was on leave because of work-related stress, and he "was going to take anything away from her that was going to maybe keep her out longer . . . I wanted to take all her temptations away of using the postal service, getting on e-mails, doing anything that may trigger something else."   Ex. 11 at 166:8-16. Plaintiff knew of other employees who were on extended sick leave who were able to keep their laptop and Blackberry during leave.   According to Plaintiff, Mike Flores kept his electronic

equipment when he was on sick leave for a bypass, and also on different occasions when he took

leave when his mother was ill; and a female manager in Arizona who kept her computer while on

leave after suffering a mini-stroke.  Ex. C at 125:7-25.  Even assuming Plaintiff's facts to be true,

this evidence does not suggest that Trujillo's decision to have Plaintiff turn in her electronic

equipment was motivated by discriminatory intent or by Plaintiff's gender.  The other employees

mentioned by Plaintiff were on leave for different reasons (and one of these individuals, by

Plaintiff's own admission was also female), and Trujillo's concern that working from home

would only aggravate Plaintiff's stress and compound her leave time was a reasonable and

legitimate business reason.

     E.    Other Job Openings

In December 2012, Plaintiff applied for a position in Coppell, Texas, but she was not

interviewed for the job.   Flores was aware of Plaintiff's application but he had no

communications with anyone regarding Plaintiff's application, nor was he asked for a

recommendation.  Ex. 3 at 91:11-25.  Flores' familiarity with the application was based on his

review of Plaintiff's deposition in this case.  Ex. 3 at 90:15-25.  He states that he did not

communicate with anyone regarding Plaintiff's job application, and that nobody asked him for a

recommendation.  Ex. 3 at 91:8-10; 17-18.  Plaintiff offers no facts which dispute Flores'

statements and therefore offers no evidence to suggest that Flores had anything to do with the

fact that she did not get interviewed or selected for that position.

**III.**   **Discrimination Claims**

Both Counts I and III are described as violations of Title VII based on "sexual

harassment" and the Court has conducted the above analysis based on the arguments in the

pleadings which have treated Counts I and III as having been brought solely under a hostile work

environment theory.  However, the text of the complaint states that both Flores and Trujillo "discriminated" against Plaintiff based on gender.  For example, Plaintiff asserts that Trujillo discriminated against her by imposing unfounded and disparately focused discipline, as compared to men, treated Plaintiff with disdain and in a harassing manner, stating that he would rather work with women who would obey all orders without question, and by constantly threatening termination.  Compl., ¶91. Disparate treatment and hostile work environment claims are separate and distinct causes of action designed to redress different forms or discrimination in the work place, each having different elements of proof.  *Nat'l R.R. Passenger v. Morgan*, 536 U.S. 101, 103 (2002). Disparate treatment claims are designed to redress discrimination relating to employment decisions such as hiring and firing, compensation and other terms or conditions of employment. Hostile work environment claims, on the other hand, are designed to redress non-traditional forms of discrimination that pollute the emotional and psychological environment of the work place, ultimately altering the conditions of employment. *Meritor Savings Bank F.S.B. v. Vinson*, 477 U.S. 57, 64-67 (1986).  While there may be certain alleged acts that could be characterized as discrete acts of alleged disparate treatment (for example, refusal to approve leave requests to attend postal forums, and non-selection for the MPOO level 25 job), it appears that Plaintiff is including these acts as part of an alleged series of repeated and episodic acts that occurred over a period of time—which is characteristic of hostile environment claims. Therefore, based on the Complaint and on Plaintiff's arguments in the underlying pleadings, the Court has addressed Plaintiff's claim solely under a hostile environment theory in the above sections.[9]

---

[9]  Alleged actions underlying a hostile environment are not subject to administrative exhaustion to the same extent as disparate treatment claims.  Thus, any claim by Defendant that certain conduct by Flores or Trujillo was not included in Plaintiff's EEO charge would not apply to actions which form the basis for Plaintiff's hostile environment claims.  *See Davidson v. AOL, Inc.,* 337 F.3d 1179 (10th Cir. 2003) (citing *Nat'l RR Passenger Corp.*

Plaintiff's claims would be meritless even under a disparate treatment theory, which would be analyzed somewhat differently.  For those claims, Plaintiff would be required to establish a prima facie case by showing (1) that she belongs to a protected class; (2) that she suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir.2000).  Even assuming that Plaintiff satisfied the first two prongs, Plaintiff would not be able to meet her ultimate burden of proving intentional discrimination.  *See Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir.2015); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir.2008) (under Title VII, a plaintiff bears the ultimate burden of proving intentional discrimination).

Disparate treatment claims are subject to the three-pronged burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  Thus, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action.  If the defendant does so, the plaintiff may survive summary judgment by showing that there is a genuine dispute of material fact as to whether the proffered reason for the challenged action is pretextual.  *See Richmond v. Oneok, Inc.,* 120 F.3d 205, 208 (10th Cir. 1997).

The Court has discussed at length all the legitimate reasons provided by Defendant for the actions taken by Flores and Trujillo, and the Court finds, based on that discussion, that Defendant has more than sufficiently satisfied its burden of showing legitimate reasons for that conduct under a disparate treatment theory.  In the last part of the burden-shifting analysis, a plaintiff must show that these reasons were "so incoherent, weak, inconsistent, or contradictory

---

*v. Morgan,* 536 U.S. 101, 114 (2002) (hostile environment claims not subject to individual exhaustion as long as one of the component actions occurred within limitations period).

that a rational fact finder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.,* 468 F.3d 1243, 1250 (10th Cir. 2006).  Plaintiff has failed to present any facts to infer pretext on the part of Defendant.  The Court finds that there is no evidence at all from which a reasonable fact finder could infer that Plaintiff was subjected to any differential treatment based on her gender.  Accordingly, to the extent Plaintiff is attempting to bring her claims as part of a disparate treatment claim, that attempt fails and Defendant is entitled to summary judgment on Counts I and III under that theory as well.

## IV.    Remaining Claims

In this Memorandum Opinion and Order, the Court rules on Counts I and III.  The Court has also previously ruled on Counts II and IV, granting summary judgment to Defendant on those claims. *See* Doc. 121.  Two claims remain in the Complaint which have not been addressed by the Court: Count V asserts a violation of USPS Labor Manual Rule (ELM) §666.22 (Discrimination and Retaliation), and Count VI asserts a violation of USPS employee labor manual (ELM) §666.22 (Whistleblower Protection Retaliation). Because neither of these are federal claims, the Court declines to exercise supplemental jurisdiction over Counts V and VI, pursuant to 28 U.S.C. §1367.  *See Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir.1998) (when all federal claims have been dismissed, the court . . .  "usually should decline to exercise jurisdiction over any remaining state claims"); *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (district court should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when federal claims are dismissed before trial).

## CONCLUSION

In sum, the Court finds and concludes that Defendant is entitled to summary judgment on Counts I and III of the complaint which asserts violations of Title VII based on hostile work environment against Mike Flores and Humberto Trujillo.

Hostile environment claims require a showing of severe and pervasive harassment that is based on gender.  Here, the alleged conduct, even when considered together and in the light most favorable to Plaintiff, does not satisfy the severe or pervasive requirement for such claims, nor does any of this conduct suggest that the actions of either Flores or Trujillo were motivated by, or based on, Plaintiff's gender.

The Court believes it is worth reiterating its previous assessment of this case, in that "what is driving Plaintiff's hostile environment claim is a personality clash between Plaintiff and her supervisors, Mike Flores and Humberto Trujillo which is two-sided, based on outside accounts."  Doc. 120 at 24.  One such account was provided by HR manager Lerene Wiley who noted that there was "constant digging between the two [Plaintiff and Flores]" and who observed the following:

> Ms. Montano and Mr. Flores frequently make condescending comments to one another on telecons and during conversations.  These perceptions should be brought to the attention of Ms. Montano and Mr. Flores and they should be advised to find a way to communicate more professionally and without the use of condescending comments especially in the presence of others.

Doc. 120 at 24 (citing Doc. 115-26).  Personal dislike in itself is not a basis for a hostile environment claim.  *See, e.g., Mitchell v. ESPY*, 845 F.Supp. 1474, 1493 (D.Kan. 1994) (dislike is not a pretext for discrimination); *Rakovich v. Wade*, 850 F.2d 1180, 1192-93 (7th Cir. 1987) (generic dislike is not retaliation).

**THEREFORE,**

**IT IS ORDERED** that Defendant's Second Motion for Summary Judgment on Plaintiff's Counts I and III (**Doc. 130**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order;

**IT IS FURTHER ORDERED** that the Court DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION UNDER 28 U.S.C. §1367 over Counts V and VI of the Complaint.

A Rule 58 Judgment shall be entered separately.

_____

UNITED STATES DISTRICT JUDGE